UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-cv-23663-ALTMAN

BRILL MARITIME, INC.,

    *Plaintiff*,

*v.*

BOATS GROUP, LLC,

    *Defendant*.

_____/

## ORDER

A boat brokerage has sued the operator of online boat advertisement platforms, alleging violations of § 2 of the Sherman Act. The Defendant now moves to dismiss all counts. After careful review, we **GRANT** the motion to dismiss.

## THE FACTS

Our Defendant, Boats Group, LLC ("Boats Group"), operates "the three largest online platforms that connect buyers and sellers of recreational boats in the U.S." Complaint [ECF No. 1] ¶ 2.[1] These platforms, "Boat Trader, YachtWorld, and boats.com," "are used by boat brokerages and dealers to advertise and sell recreational vessels to consumers." *Ibid.* "Through subscription-based packages, sellers pay Boats Group to have their inventory listed and marketed to a broad audience of prospective buyers." *Ibid.* "These platforms serve as critical advertising and lead-generation tools for boat brokerages, dealers, and other sellers throughout the U.S." *Id.* ¶ 6. Our Plaintiff, Brill Maritime, Inc. ("Brill"), is in "the business of marketing and selling recreational marine vessels and relies heavily

---

[1] We accept the allegations of the Complaint [ECF No. 1] as true for purposes of this Order. *See Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) ("In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but 'legal conclusions without adequate factual support are entitled to no assumption of truth.'" (quoting *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (cleaned up))).

on digital platforms to advertise its inventory to prospective buyers." *Id.* ¶ 5. As a "boat brokerage,"
Brill "purchases [ ] subscriptions from Boats Group to market its inventory to potential buyers." *Id.*
¶ 3.

On August 14, 2025, Brill brought this antitrust class action against Boats Group, alleging that
Boats Group has "willfully acquired[,] maintained[,] and expanded monopoly power in this market by
engaging in exclusionary and anticompetitive conduct, including the serial acquisitions of its main
competitors, unilateral price increases, restrictive contractual terms, and practices that hinder entry
and expansion by rival platforms." *Ibid.* Brill "has been directly harmed by Boats Group's conduct"
because it "has been forced to pay supracompetitive prices for essential marketing services with
effectively zero viable alternatives available." *Id.* ¶ 4.

The Complaint advances five counts: Monopolization in violation of the Sherman Act Section
2 (Count I), *see id.* ¶¶ 51–60; Attempted Monopolization in violation of the Sherman Act Section 2
(Count II), *see id.* ¶¶ 61–67; Monopolization in violation of Florida Antirust Law (Count III), *see id.*
¶¶ 68–72; Attempted Monopolization in violation of Florida Antitrust Law (Count IV), *see id.* ¶¶ 73–
77; and Violation of the Florida Deceptive and Unfair Trade Practices Act (Count V), *see id.* ¶¶ 78–83.
For Counts I and II, Brill is suing on behalf of the following putative class: "All persons and entities
in the United States who purchased subscription-based marketing and listing services from Boats
Group between January 1, 2014 and the present, and who suffered damages as a result of Boats
Group's anticompetitive conduct." *Id.* ¶ 36. Counts III–V are brought on behalf of only Florida
plaintiffs. Boats Group now asks us to dismiss all five claims. *See generally* Motion to Dismiss (the
"MTD") [ECF No. 15].[2]

---

[2] The Defendant's MTD is fully briefed and ripe for adjudication. *See* Plaintiff's Response in
Opposition to Defendants' Motion to Dismiss the Complaint ("Resp.") [ECF No. 25]; Defendants'
Reply in Support of Defendants' MTD ("Reply") [ECF No. 29].

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## ANALYSIS

Brill is suing under § 2 of the Sherman Act, which makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. In other words, § 2 prohibits monopolization, attempts to monopolize, and conspiracies to monopolize. "Section 2, in contrast to [Section] 1, 'covers both concerted and independent action, but only if that action 'monopolizes,' or 'threatens actual monopolization,' which is 'a category that is narrower than restraint of trade' in [Section] 1." *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1240 (11th Cir. 2021) (first

3

quoting § 2; and then quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (cleaned up)).

Our Plaintiff brings two claims under § 2: one for actual monopolization, *see* Compl. ¶ 54 ("Boats Group has willfully acquired, maintained, and expanded its monopoly power through exclusionary conduct not based on superior products or competition on the merits."); and a second for attempted monopolization, *see id.* ¶ 62 ("Boats Group has engaged in a course of anticompetitive conduct, including exclusionary acquisitions, restrictive dealing provisions, and the imposition of supracompetitive prices, with the specific intent to acquire, maintain, or expand monopoly power in the market for online boat listing and marketing services in the U.S."). We consider each in turn.

## I.    The Monopolization Claim

"The offense of monopoly under [Section] 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Ibid.* (citing *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001)).

Boats Group tells us that "[t]here are three fundamental deficiencies in [Brill's] monopolization claim that warrant dismissal of Count I: (1) [Brill] has failed to properly plead that Boats Group engaged in any exclusionary acts; (2) [Brill] has failed to properly plead a relevant market; and (3) [Brill] has failed to properly plead that Boats Group has monopoly power." MTD at 22.

### a.   Brill has plausibly alleged the first prong of a monopolization claim

We'll start with the first prong: "the possession of monopoly power in the relevant market." *Grinnell*, 384 U.S. at 570. As the Eleventh Circuit has explained, "Section Two claims require harm to competition that must occur within a 'relevant,' that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004); *see also U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 995 (11th Cir. 1993) ("Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other."). Then, "the alleged monopolist must possess enough power or potential power in this 'relevant market' in order to harm competition." *Ibid.* (citing *Morris*, 364 F.3d at 1293–94). The first prong, therefore, has two elements: a relevant market and market power. Brill has sufficiently pled both.

### i.   Brill has sufficiently pled a relevant market

At the motion-to-dismiss stage, "antitrust plaintiffs [] must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) (citing *Thompson v. Metro. Multi– List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991)). The Supreme Court has instructed that, "in antitrust cases, where 'the proof is largely in the hands of the alleged [monopolist],' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962)). For this reason, "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases," *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1070, and "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic," *E.I. du Pont de Nemours & Co. v. Kolon Indus.,*

5

*Inc.*, 637 F.3d 435, 443 (4th Cir. 2011).[3] "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.). "Stated differently, dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of 'glaring deficiencies,' such as failing to allege a relevant market." *E.I. du Pont de Nemours*, 637 F.3d at 444 (cleaned up). We find no "glaring deficiencies" in the Complaint at this early stage of the case.

Brill alleges that "[t]he relevant geographic market is the United States," Compl. ¶ 12, and that the relevant product market is "online marine vessel listing and marketing services," *id.* ¶ 13. "This market comprises digital platforms that facilitate the professional listing, promotion, and sale of recreational boats and yachts, primarily serving licensed brokers and dealers." *Ibid.*

Boats Group says this isn't enough. Brill, it avers, has failed to "proffer sufficient allegations in its Complaint to plausibly suggest the contours of the relevant geographic and product markets." MTD at 14 (citing *Jacobs*, 626 F.3d at 1336). *First*, Boats Group tells us that "the relevant geographic market" is "artificially narrow" and "fails to correspond to the commercial realities of the industry"

---

[3] *See also Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery."); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers"); *Corey Airport Servs., Inc. v. Atlanta*, 2005 WL 8158629, at *13 (N.D. Ga. July 12, 2005) (Pannell, Jr., J.), *aff'd*, 181 F. App'x 908 (11th Cir. 2006) ("Thus, in order to survive a motion to dismiss, the plaintiff need only allege a cognizable relevant market sufficient enough to put the defendant on notice of the plaintiff's antitrust claim and the basis for that claim." (citing *U.S. Anchor*, 7 F.3d at 994–95)).

because it "encompasses only online marine vessel listing and marketing services in the United States." *Id.* at 16; *see also ibid.* (arguing that the Plaintiff "never explains why buyers or sellers of marine vessels, even if they are physically located in the United States, could not turn to online marketplaces located abroad to be a sufficient substitute" and that the Plaintiff also "does not, and cannot, plausibly allege that such [foreign] marketplaces do not compete with marketplaces located in the United States"). But Boats Group imposes on Brill too high a burden at the motion-to-dismiss stage. Our Defendant may ultimately be right that the geographic market should be expanded beyond the United States. That, however, is a question for summary judgment. *See Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991) ("The parameters of a given market are questions of fact."). At our phase of the case, then, "Rule 12(b)(6) dismissal is appropriate [only] where the plaintiff's description of the geographic market is legally inadequate and/or wholly conclusory." *Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) (Jordan, J.). The Complaint pleads that "[t]he relevant geographic market is the United States," and that "Boats Group's platforms are marketed, operated, and used by sellers and buyers nationwide." Compl. ¶ 12. This is neither legally inadequate nor wholly conclusory. *But see Q Club*, 2010 WL 11454483, at *2 (finding that the plaintiff failed to sufficiently plead the relevant geographic market where the complaint merely alleged that the defendant was "one of the first premier condo hotel properties on Ft. Lauderdale Beach"). We therefore conclude that the Complaint "plausibly suggest[s] the contours of the relevant geographic market[.]" *Jacobs*, 626 F.3d at 1336.

  *Second*, Boats Group argues that the Complaint "fails to allege any facts 'plausibly suggesting' the contours of the relevant product market," because it "never explains why boat buyers do not find obvious alternatives like Facebook marketplace, newspapers, or other advertising to be interchangeable with online boat listings[.]" MTD at 17 (quoting *Jacobs*, 626 F.3d at 1338). Again, we disagree. "Defining the relevant product market involves identifying producers that provide customers

of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Jacobs*, 626 F.3d at 1337 (cleaned up). "The market is composed of products that have reasonable interchangeability." *Ibid.* "Most importantly, we should look to the uses to which the product is put by consumers in general." *Ibid.*

Boats Group argues that Brill improperly circumscribes the market to "*online* marine vessel listing and marketing services," Compl ¶ 13 (emphasis added), rather than *all* print and digital platforms, *see* MTD at 17 ("[Brill] asserts that traditional advertising channels and general online marketplaces are not interchangeable for 'boat listing and marketing services' from the seller's perspective, nor does [Brill] explain why only 'online' marketplaces should be [in]cluded.").

The Eleventh Circuit has recognized that "[a] relevant product market can exist as a distinct subset of a larger product market." *Jacobs*, 626 F.3d at 1337 ("Within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." (citing *U.S. Anchor*, 7 F.3d at 995)). The Supreme Court has outlined some "practical indicia" to help us determine the contours of the appropriate submarket, such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

And the Complaint does a pretty good job of distinguishing between the online submarket and the broader, traditional advertising market—and of explaining why the latter isn't an effective alternative:

> The platforms provide a suit of specialized tools, including marine-specific inventory management systems, integration with multiple listing services (MLS), customized sales presentation tools, contract drafting capabilities, and buyer analytics. . . .
>
> Traditional advertising channels, such as newspapers, or boating magazines, are not effective alternatives, as they lack the reach, interactivity, and buyer targeting that online platforms provide. General online marketplaces (e.g., Craigslist or Facebook Marketplace), or private broker websites are also not adequate substitutes, as they do

not offer the professional-grade functionalities or visibility required by commercial sellers.

Compl. ¶¶ 13, 15. That's more than enough for now.

Still resisting, Boats Group counters that the "proposed product market is gerrymandered" because Brill "alleges no facts supporting its assertion that all of these functions are necessary to compete with Boats Group's platforms, nor that a 'specialized' platform is necessary." Reply at 11. But Boats Group cites no law for its position that the specialized features must be "necessary" in order to constitute an appropriate submarket. *Cf. Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). And that's probably because that isn't the law. Instead, as we've seen, a plaintiff need only show the "practical indica" of a submarket. And that's what our Plaintiff has done here.

In the end, our Defendant fails "to cite any Eleventh Circuit authority for the proposition that a plaintiff must provide a more expansive relevant market definition in the complaint in order to survive a motion to dismiss." *Corey Airport Servs., Inc. v. Atlanta*, 2005 WL 8158629, at *13 (N.D. Ga. July 12, 2005) (Pannell, Jr., J.), *aff'd*, 181 F. App'x 908 (11th Cir. 2006) (citing *U.S. Anchor*, 7 F.3d at 994–95). In any event, "in the Eleventh Circuit, the definition of a relevant market is generally a question of fact. Such a complex factual determination must be made at the summary judgment stage or at trial after the parties have had a chance to conduct discovery and present the relevant economic and expert evidence necessary to make such a determination." *Ibid.* We therefore find that Brill has "present[ed] enough information in [the] [C]omplaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336.[4]

---

[4] At summary judgment, however, Brill will have to marshal evidence to support its market definition. *See Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010) ("At summary judgment, an antitrust plaintiff asserting a claim under Sherman Act Section 2 must submit admissible evidence of the relevant product and geographic market that would be sufficient to sustain a jury verdict on the issue of market definition."); *Michaels v. Sasser's Glass Works Inc.*, 662 F. Supp. 3d

ii.           **Brill properly alleges that Boats Group exercises monopoly power**

Brill likewise sufficiently alleges that Boats Group has monopoly power in the relevant market of "online marine vessel listing and marketing services." Compl. ¶ 13. Monopoly power is "the power to control prices or exclude competition" in a given market. *E.I. du Pont de Nemours*, 351 U.S. at 391. "It is not necessary that the power thus obtained should be exercised. Its existence is sufficient." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946). "Market power is the ability to raise price significantly above the competitive level without losing all of one's business." *Graphic Prods. Distrib., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983). "Market share is frequently used in litigation as a surrogate for market power for two reasons." *Ibid.* "First, market power is conceptually difficult to define in any given case. Second, its measurement requires sophisticated econometric analysis." *Ibid.* "Therefore, market power is not well suited to presentation in an adversary proceeding." *Ibid.*; *see also U.S. Anchor*, 7 F.3d at 999 ("The principal measure of actual monopoly power is market share[.]").

Here, Brill alleges that our Defendant "controls a dominant share of the U.S. market for online boat listing and marketing services, operating the three largest online platforms used by brokerages." Compl. ¶ 16. Specifically, Brill observes that "Boats Group publicly claims to hold approximately 75% of the global market for such services." *Ibid.* Recognizing that the relevant market is the *U.S. boat-listing market*, Brill reasons that, "[w]hile that figure encompasses international operations, Boats Group owns and operates the leading platforms used by U.S.-based boat brokerages and sellers, and no comparable U.S.-based competitors operate at a similar scale or reach." *Ibid.* "Boats Group's share of the U.S. market," Brill continues, "is believed to be similarly high, if not greater, than its global share and sufficient to confer monopoly power in the relevant geographic market." *Ibid.* In other words, Brill

_____

1223, 1233 (S.D. Fla. 2023) (Altman, J.) ("[A]t summary judgment, the parties must produce evidence for their positions.").

10

tells us what Boats Group advertises as its percentage of the *international* market, but it doesn't really know what its percentage of the relevant U.S. market is.

Picking up on this discrepancy, Boats Group says that "[t]he Complaint contains no allegations at all about Boats Group's market share in the market that [Brill] contends has been illegally monopolized." MTD at 18. Brill, in Boats Group's view, merely "asks the Court to make inferences about Boats Group's market share in the alleged relevant market based on purported statistics that relate to other geographies and are vague as to the platforms and services to which they apply." *Ibid.* Boats Group concludes that "[t]hese allegations are simply not enough to plausibly allege that Boats Group has market power." *Id.* at 19.

Although Boats Group's argument may well prevail at summary judgment, we think that Brill has done *just* enough to survive the motion to dismiss. "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1070.[5] Brill has pled that Boats Group holds "75% of the global market," and its "share of the U.S. market is believed to be similarly high" because Boats Group "owns and operates the leading platforms used by U.S.-based boat brokerages and sellers, and no comparable U.S.-based competitors operate at a similar scale or reach." Compl. ¶ 16. At the motion-to-dismiss stage, we must draw all reasonable inferences for the plaintiff. *See Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1159 (11th Cir. 2025) ("Again, at the motion-to-dismiss stage, we accept the complaint's well-pleaded allegations as true and draw all reasonable inferences in the relators' favor."). At this early phase of the case, then, Boats Group's possession of

---

[5] *See also Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 998 (11th Cir. 1983) (explaining that arguments about market power are "persuasive but inappropriate in a motion to dismiss for failure to state a claim"); *Hosp. Bldg.*, 425 U.S. at 746 ("[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (citing *Poller*, 368 U.S. at 473)); *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 421 (1st Cir. 2000) ("[D]oubts about market power cannot be resolved on a motion to dismiss[.]").

75% of the global market, along with its ownership and operation of "the leading platforms used by U.S.-based boat brokerages and sellers," Compl. ¶ 16, supports "the reasonable inference" that Boats Group has similar market share in the U.S., *Iqbal*, 556 U.S. at 678. And 75% is certainly enough, at this stage, to support a plausible claim that Boats Group has what the law characterizes as monopoly power over the U.S. market. *See Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 1350, 1362 (S.D. Fla. 2003) (Seitz, J.), *aff'd sub nom. Spanish Broad. Sys. of Fla.*, 376 F.3d at 1065 (finding allegation that defendant possessed 51% of the relevant market sufficient to establish monopoly power at the motion-to-dismiss stage); *Iris Wireless LLC v. Syniverse Techs.*, 49 F. Supp. 3d 1022, 1031 (M.D. Fla. 2014) (finding sufficient allegations of monopoly power at the motion-to-dismiss stage where plaintiff claimed that the defendant controlled "50% or more" of the relevant market); *cf. Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power.").

### b. Brill has failed to plead the second element of a § 2 violation

But Brill has failed to properly plead "the willful acquisition or maintenance of [the monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71. As the Supreme Court has explained:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

The second element of our test therefore "requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Morris*, 364 F.3d at 1294 (citing *Microsoft*, 253 F.3d at 58). "In order for a practice to be exclusionary, it must harm

the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58 (cleaned up). "[H]arm to one or more *competitors* will not suffice for a [§] 2 violation." *Ibid.*; *see also Spanish Broad. Sys. of Fla.*, 376 F.3d at 1075 ("[C]onduct that injures individual firms rather than competition in the market as a whole does not violate Section Two."). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993); *see also Mfg. Rsch. Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir. 1982) ("Our cases have recognized that injury to a competitor need not always result in injury to competition. The use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws.").

Brill points to three allegedly exclusionary acts. *First*, it says that, twenty years ago, Boats Group "entrenched its monopoly position through a series of strategic acquisitions[.]" Compl. ¶ 55. *Second*, it claims that Boats Group has entered into "exclusionary contracts" that "prohibit or discourage brokerages from listing inventory on rival platforms." *Id.* ¶ 33. *Third*, it insists that Boats Group imposed "supracompetitive pricing[.]" *Id.* ¶ 55. Even taken together, these three claims are insufficient to satisfy the second element of the Sherman Act test.

i.      **The alleged acquisitions aren't anticompetitive**

Brill alleges that Boats Group "entrenched its monopoly position through a series of strategic acquisitions that eliminated its largest competitors, enabled it to impose sustained supracompetitive pricing, and facilitated its use of exclusive dealing provisions that foreclose competitors from accessing necessary inventory and scale." *Ibid.* Specifically, Brill says that Boats Group's parent company "consolidated control of the industry by acquiring two of its main competitors, YachtWorld.com and boats.com, bringing all three major players under common ownership and substantially reducing competition in the relevant market." *Id.* ¶ 27. Then, in 2017, Boats Group "acquired YachtCloser.com, the leading digital contract management platform for yacht brokerages." *Id.* ¶ 28; *see also* Defendant's

13

Reply (the "Reply") [ECF No. 29] at 4 ("Boats Group secured market dominance by systematically eliminating its competition through a series of strategic acquisitions. Beginning in 2004 and continuing through 2017, Boats Group conducted an industry roll-up by acquiring its main competitors.").

Boats Group disagrees that these acquisitions satisfy the second prong. As Boats Group sees it, the acquisitions of "YachtWorld.com and boats.com [occurred] *over two decades ago* in 2004," so Brill's monopolization claim is "barred by the four-year statute of limitations for antitrust claims and laches to the extent that [Brill] relies on these acquisitions." MTD at 11. Brill admits that "these acquisitions closed some years ago," but insists that doesn't matter because Boats Group "only recently . . . exploit[ed] its market power to impose steep, sustained, supra-competitive price increases on its customer base." Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the Complaint ("Resp.") [ECF No. 25] at 6. But both parties miss the point.

"Not the possession, but the abuse, of monopoly power violates [S]ection 2." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 374 (7th Cir. 1986) (Posner, J.); *see also Verizon*, 540 U.S. at 415–16 ("The Sherman Act . . . does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."); *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 692 n.15 (10th Cir. 1989) ("Section 2 of the Sherman Act does not punish the mere possession of monopoly power.").

That Boats Group may have had the *power* to operate a monopoly twenty years ago thus isn't enough to show that it engaged in illegal conduct today. Instead, Brill must demonstrate that Boats Group engaged in exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 571. "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers. . . . [H]arm to one or more *competitors* will not suffice." *Microsoft*, 253 F.3d at 58. This focus on an anticompetitive effect is

14

essential because "it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). But Brill never alleges that the acquisitions *themselves* had an "anticompetitive effect" or that, when Boats Group made those acquisitions, it did so out of a desire to engage in exclusionary conduct or to gain monopoly power. In fact, Brill alleges that the acquisitions were merely "strategic," Compl. ¶ 55—in other words, that Boats Group used its "business acumen" to achieve monopoly power. And it's well-settled that, "[i]f the company achieves its power through purely legitimate means, that is, growth or development as a consequence of a superior product, business acumen, or historic accident, then it has not violated the antitrust laws." *Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1357 n.24 (5th Cir. 1980)[6] (noting that "growth or development as a consequence of a superior product, business acumen, or historic accident" doesn't violate the antitrust laws (quoting *Grinnell*, 384 U.S. at 571)).[7]

In other words, accepting the Complaint's allegations as true, the acquisitions *may have* resulted in Boats Group obtaining a monopoly. But the mere acquisition of monopoly power isn't illegal.[8] And

---

[6] Decisions of the former Fifth Circuit handed down before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[7] *See also Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 968 (11th Cir. 2006) ("[T]he propriety of mergers and asset acquisitions is measured by the competitive effects such acquisitions would have in the relevant market, not by the level of competition in the market for the target company or acquisition."); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 527 (5th Cir. 1999) ("Competition, even the maintenance of monopoly, through superior business acumen is allowed under section 2."); *Trace X Chem., Inc. v. Can. Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984) ("Anti-competitive conduct is conduct without legitimate business purpose. Such conduct makes sense only because it eliminates competition. Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2. The exercise of business judgment cannot be found to be anti-competitive." (citations omitted)); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) ("Emerging victorious from competition, however, is not illegal under the Sherman Act.").

[8] In fact, Brill admits that Boats Group "only recently . . . exploit[ed] its market power to impose steep, sustained, supra-competitive price increases on its customer base." Resp. at 6. Brill, in short, acknowledges that the acquisitions themselves *didn't* violate the antitrust laws. So, while Boats Group's

Brill never alleges that, as part of these acquisitions, Boats Group engaged in *any* anticompetitive conduct. Brill has thus failed to plead that Boats Group's acquisitions amounted to "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Morris*, 364 F.3d at 1294.

### ii.      Boats Group's Contracts Aren't Exclusive Dealing Provisions

Brill next alleges that Boats Group used "exclusive dealing provisions that foreclose competitors from accessing necessary inventory and scale." Compl. ¶ 55. According to Brill, "Boats Group reinforces its market dominance through the use of contractual restraints that functionally foreclose competition." *Id.* ¶ 23. "Specifically," it says, "Boats Group's subscription agreements contain exclusive dealing provisions that either prohibit or strongly discourage sellers, particularly brokers and dealers, from listing their inventory on competing platforms." *Ibid.* In the Complaint, Brill cites the following exclusive dealing provisions (the "Terms"):

> 24.5 Customer Responsibilities. Customer shall cooperate with Boats Group in its performance of the Services by, without limitation: . . .
>
> 24.5.3 providing Boats Group with timely access to data, information and personnel of Customer. Customer is prohibited, now and in the future, from any conduct that would imply in any way to any third party that any Customer listings originate from other than Boats Group.

*Ibid.* As Brill reads the Terms, "[t]hese exclusive dealing clauses prevent rival platforms from gaining access to the scale and inventory necessary to attract users and build network effects." *Id.* ¶ 24. "As a result," it claims, "sellers who might otherwise consider switching platforms or dual-listing are contractually restricted, making multi-homing or platform-switching commercially impractical or outright impossible." *Ibid.* "In this context," Brill concludes, "exclusive contracts substantially foreclose access to essential competitive inputs (listings and traffic), deny rivals the scale necessary to

---

subsequent conduct *may* (or may not) have violated the Sherman Act, Brill seems to concede that there was nothing illegal about the acquisitions themselves.

challenge Boats Group, and harm consumers by stifling competition on price, service, and innovation." *Id.* ¶ 25.

Boats Group doesn't see it this way. It counters that the Complaint "does not point to any actual agreement that prevents any seller from listing a boat on any other marketplace." MTD at 12. Instead, "the provision simply prohibits customers from misrepresenting that 'Customer listings' *on Boats Group's websites* originate from some other source." *Ibid.* According to Boats Group, the Plaintiff "does not (and cannot) allege that Section 24.5.3 has prevented any seller from listing a boat for sale on any other online platform." *Ibid.* "Nor," Boats Group continues, does the Complaint "even allege that [the Plaintiff] was ever prevented from listing inventory on other platforms[.]" *Ibid.* Brill, the Defendant concludes, "has therefore failed to plead exclusionary conduct, and its claims must be dismissed." *Id.* at 13. We agree.

The Terms simply don't say what Brill claims they say. "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *Am. Proteins, Inc. v. River Valley Ingredients, Inc.*, 2026 WL 1003330, at *27 (N.D. Ga. Mar. 3, 2026) (Story, J.) (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012)); *see also Indus. Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 286 (6th Cir. 1977) ("By definition an exclusive dealing contract excludes potential competitors from competition with the exclusive dealer."). But the Terms don't prevent any broker from advertising on any third-party platform. Instead, they prohibit brokers from "imply[ing] in any way to any third party that any Customer listings originate from other than Boats Group." Compl. ¶ 23. In other words, a broker may list a boat with Boats Group *and* as many other platforms as it wishes. But it *may not* post a listing on Boats Group *and then* direct its customers to another site or advertise that the listing *originates* from another site. For example, a Boats Group listing may not direct a customer to a newspaper listing. That's not an exclusive dealing provision. In determining what qualifies as an exclusive dealing provision, courts

generally consider "market realities" rather than "formalistic distinctions." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 835 (11th Cir. 2015). "Exclusive dealing arrangements are essentially requirements contracts, whereby the buyer agrees to purchase exclusively the product of the contracting supplier." *Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F. Supp. 1042, 1064 (N.D. Ga. 1994), *opinion amended on reconsideration sub nom. Servicetrends, Inc. v. Siemens Med. Sys.*, 1994 WL 776878 (N.D. Ga. June 24, 1994) (Camp, J.). And, as we've said, the Terms don't require any broker to purchase exclusively from (or list exclusively with) Boats Group.

But here's the thing: Even if the Terms *were* exclusive dealing provisions, Brill's claim would still fail. "As we've observed, exclusive dealing arrangements are not per se unlawful, but they can run afoul of the antitrust laws when used by a dominant firm to maintain its monopoly." *McWane*, 783 F.3d at 832. An exclusive dealing arrangement doesn't violate the antitrust laws "unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). And this is where Brill runs into trouble. The Complaint fails to allege any facts to show that the Terms are in any way anticompetitive or that they otherwise harm consumers—the very heart of a § 2 claim. *Cf. Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."). True, the Complaint alleges that the Terms make "multi-homing or platform-switching commercially impractical or outright impossible" and that they "harm consumers by stifling competition on price, service, and innovation." Compl. ¶ 25. But it doesn't produce any *facts* to support this conclusory claim. As we've said, "[t]o survive a motion to dismiss, a complaint must do more than simply offer labels or a formulaic recitation of the elements of a cause of action." *Betts v. Hall*, 679 F. App'x 810, 812 (11th Cir. 2017). "Absent further factual enhancement, naked assertions that the defendant acted unlawfully will not state a claim for relief." *Ibid.*; *see also Captain Jack's Crab Shack, Inc.*

18

*v. Cooke*, 2022 WL 4375364, at *7 (11th Cir. Sept. 22, 2022) ("After *Twombly* and *Iqbal*, we do not credit conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts.").

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). "The antitrust laws allow legal monopolies to compete vigorously on the merits in the relevant market, even if such competition drives out competitors." *Gulf States*, 466 F.3d at 967 n.3 (citing *Grinnell,* 384 U.S. at 570–71); *see also Olympia Equip. Leasing Co.*, 797 F.2d at 375 (recognizing that "the lawful monopolist should be free to compete like everyone else; otherwise the antitrust laws would be holding an umbrella over inefficient competitors"). In the end, Brill has simply identified the "terms[ ] and conditions of [ ] dealing," *Pac. Bell*, 555 U.S. at 448, that allow Boats Group "to compete vigorously on the merits in the relevant market," *Gulf States*, 466 F.3d at 967. Nothing more.

### iii.       Price Increases Aren't Enough to Show Harm to Competition

Finally, Brill alleges that "Boats Group's monopoly power has allowed it to impose steep and sustained price increases on its customers, including [the] Plaintiff and members of the Classes, without corresponding improvements in quality, service, or innovation." Compl. ¶ 56. "This conduct," Brill insists, "has harmed competition, driven several businesses out of the market, and deprived customers of meaningful alternatives." *Ibid.* Boats Group responds that Brill "cannot rely on Boats Group's alleged price increases by Boats Group as the basis for its monopolization claim because 'the mere possession of monopoly power, and the concomitant charging of monopoly prices[,] is . . . not unlawful.'" MTD at 14 (quoting *OJ Com., LLC v. KidKraft, LLC*, 34 F.4th 1232, 1244 (11th Cir. 2022) ("[C]harging monopoly prices—without accompanying anticompetitive conduct—is not enough to state a claim under Section 2.")). Again, we agree.

As we've said, "setting a high price is not in itself anti-competitive." *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 268 (8th Cir. 1984) (citing 3 P. Areeda & D. Turner, *Antitrust Law*

41–42, 148 (1978)). "Section 2 does not forbid a monopolist to set profit-maximizing prices." *Ibid.*

"Such conduct is not the exclusionary conduct that violates the antitrust laws, but rather is the normal,

rational response of a business seeking to maximize profits, sales or revenues." *Ibid.* (cleaned up).[9] In

other words, "[a] natural monopolist that acquired and maintained its monopoly without excluding

competitors by improper means is not guilty of 'monopolizing' in violation of the Sherman Act, and

can therefore charge any price that it wants, for the antitrust laws are not a price-control statute or a

public-utility or common-carrier rate-regulation statute." *Blue Cross & Blue Shield United of Wis. v.*

*Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995) (Posner,

C.J.). As the Seventh Circuit has explained:

> Even if it could be said that the City possessed monopoly power, plaintiffs have not
> presented sufficient facts to meet the second requirement under § 2, anti-competitive
> behavior or abuse of market power. The mere existence of the power to control prices
> or exclude competition is not unlawful unless it is coupled with intent. By intent, we
> do not mean intent to obtain a monopoly or to capture an ongoing increase in market
> share. This of course is the aim of every business endeavor. Under § 2, intent to obtain
> a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly

---

[9] Courts are in near-universal agreement that charging higher prices—even excessive prices—doesn't violate the antitrust laws. *See, e.g.*, *Verizon*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is . . . not unlawful[.]"); *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1121 (6th Cir. 1983) ("Even assuming that the pole rates were unreasonable, this would not in itself be conclusive of an anticompetitive purpose or effect. Moreover, and of critical importance, we are persuaded that the rates established by defendants were not designed 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948))); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) ("But unless the monopoly has bolstered its power by wrongful actions, it will not be required to pay damages merely because its prices may later be found excessive. Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive."); *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) (Easterbrook, J.) ("A high price is not itself a violation of the Sherman Act."); *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1087–88 (9th Cir. 2025), *cert. denied*, 2026 WL 1052046 (U.S. Apr. 20, 2026) ("True, increased prices can serve as evidence of 'a substantial anticompetitive effect' in the context of certain agreements. But that does not mean an individual firm's independent choice to charge higher prices itself harms competition. Here, Plaintiffs confuse cause and effect—higher prices can be a possible *result* of anticompetitive behavior, but charging a higher price by itself is not anticompetitive."); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021) ("[P]rice increases, without more, do not constitute supracompetitive pricing."); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("[A] firm's comparatively high price may simply reflect a superior product.").

> power by anticompetitive means. As such, the Sherman Act does not prohibit an entity possessing market power from simply raising prices in order to increase revenues. For a § 2 violation, more is needed.

*Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) (first citing *United States v. Griffith*, 334 U.S. 100, 107 (1948); and then citing *U.S. Steel Corp. v. Fortner Enters. Inc.*, 429 U.S. 610, 612 (1977)). In our case, Brill alleges nothing more than Boats Group's acquisition of monopoly power and its decision to increase prices. "Insofar as [Brill] paid high prices because [Boats Group] was a monopolist, its claim must fail because [Boats Group] was not shown to be an illegal monopolist; a lawful monopolist can charge what it wants." *Blue Cross & Blue Shield*, 65 F.3d at 1415.

### iv.    Conclusion

In sum, while Brill has successfully alleged that Boats Group has a monopoly on online boat advertising, the Complaint lacks any factual allegations of anticompetitive conduct. Indeed, the *only* factual allegations Brill advances about how Boats Group maintains its monopoly is the assertion that Boats Group provides "integrated services, such as BoatWizard (a marketing and customer relationship management tool) and YachtCloser (a service providing standardized contracts and closing tools"—tools the Plaintiff itself describes as "making Boats Group indispensable to industry participants[.]" Compl. ¶ 29. In other words, the Complaint plausibly alleges only that Boats Group's "growth or development [is] a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71. That's just not enough.

### II.    Attempted Monopolization

In Count II, Brill alleges that Boats Group attempted to monopolize in violation of § 2. *See* Compl. ¶¶ 61–67. "[A] claim for attempted monopolization under § 2 . . . [requires] three things: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015) (quoting *Spectrum Sports*, 506 U.S. at 456). "The

attempted monopolization claim is thus harder to maintain and prove than the monopolization claim." *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 2020 WL 10467232, at *9 (N.D. Ga. Feb. 26, 2020) (Brown. J.), *aff'd,* 989 F.3d 1224 (11th Cir. 2021).

In Boats Group's view, "[b]ecause Export has failed to sufficiently allege its monopolization claim, its attempted monopolization claim also fails." MTD at 22. And that's right. Brill, after all, hasn't met the first element of this claim because it hasn't plausibly alleged that Boats Group "has engaged in predatory or anticompetitive conduct[.]" *Duty Free Ams.*, 797 F.3d at 1263. Brill identifies what it says are two kinds of anticompetitive conduct: the "restrictive dealing provisions" and the imposition of "supracompetitive prices[.]" Compl. ¶ 62. As we've discussed, however, Brill doesn't come close to plausibly alleging that either Boats Group's Terms or its pricing is illegal. And "[c]onduct that does not constitute 'willful acquisition or maintenance' of monopoly power (thus precluding establishment of the offense of monopolization) *cannot* constitute the 'predatory or anticompetitive conduct' required to establish the offense of attempt to monopolize." *Transamerica Computer Co. v. Int'l Bus. Machines Corp.*, 698 F.2d 1377, 1382 (9th Cir. 1983); *see also* Areeda & Turner, *Antitrust Law* at 321 (observing that "conduct lawful for a monopolist must, *a fortiori,* be excluded as a basis for the attempt offense"); *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1497 (11th Cir. 1988) ("A distinction between a monopolization claim and an attempt to monopolize claim is that proof of specific intent is required for attempt claims."); *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593, at *7 (M.D. Fla. Mar. 8, 2021) (Covington, J.) ("[T]he only arguable distinction between monopolization and attempted monopolization in this case is that attempted monopolization requires a plaintiff to show the defendant's specific intent to monopolize." (citing *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2019 WL 8063989, at *8 (N.D. Fla. Sept. 16, 2019) (Frank, J.))); *Abbey Steam Specialty Co. v. Armstrong Int'l, Inc.*, 1987 WL 46895, at *4 (N.D. Ga. Sept. 15, 1987) (Hall, J.) ("Both the 'willful acquisition or maintenance' element of monopolization and the 'specific intent to monopolize' element of an

22

attempt to monopolize require a showing of exclusionary conduct by the defendants."); *Am. Contractors Supply*, 2020 WL 10467232, at *9 ("Without a showing of predatory or anticompetitive conduct, ACS thus cannot succeed on an attempted monopolization claim, which requires the same elements of a monopolization claim plus a specific intent."). Because, in short, our Plaintiff has failed to plausibly allege that Boats Group engaged in predatory or anticompetitive conduct, its attempted monopolization claim necessarily fails. *See Spectrum Sports*, 506 U.S. at 456 (noting that "it is generally required that to demonstrate attempted monopolization a plaintiff must prove [ ] that the defendant has engaged in predatory or anticompetitive conduct").

### III.    The State-Law Claims

The Plaintiff's § 2 claims were the only mechanism by which we could exercise original jurisdiction over this case. Without that claim, the Complaint includes only state-law claims between two Florida residents.

"When all federal claims are dismissed before trial, a district court should typically dismiss the pendant state claims as well." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018); *see also* 28 U.S.C. § 1367(c)(3) (noting that a district court may decline to exercise supplemental jurisdiction over a state-law claim where "the district court has dismissed all claims over which it has original jurisdiction"). "Although the district court has discretion, concerns of federalism—namely, of federal courts of limited jurisdiction weighing in on state law—counsel in favor of dismissing state-law claims after the federal claims are dismissed." *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 866 (11th Cir. 2022). "We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). "The Supreme Court has also put a thumb on the scale: 'In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise [pendent] jurisdiction[.]'" *Silas*, 55 F.4th at 866 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

343, 350 n.7 (1988)). "A district court, exercising its already broad discretion, will rarely err by declining supplemental jurisdiction after the federal claims that supported its jurisdiction are dismissed." *Ibid.*; *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). We'll follow the Supreme Court's admonition and decline to exercise our discretionary jurisdiction under 28 U.S.C. § 1367(c)(3) over the Plaintiff's remaining state-law claims here.

We therefore **DISMISS without prejudice** Counts III–V.

### CONCLUSION

The Plaintiff must do better in its amended complaint. "Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *Anderson v. Dist. Bd. of Tr. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366–67 (11th Cir. 1996). To avoid these problems, we'll give the Plaintiff **one** more chance to replead its claims.

\*\*\*

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1. The Defendant's Motion to Dismiss [ECF No. 15] is **GRANTED**.

2. The Complaint [ECF No. 1] is **DISMISSED without prejudice**.

3. If the Plaintiff wants to file an amended complaint, it must do so by **June 30, 2026**.

25

**DONE AND ORDERED** in the Southern District of Florida on June 16, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record