**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-23663-ALTMAN**

**BRILL MARITIME, INC. d/b/a EXPORT YACHT SALES**, on behalf of itself and all others similarly situated,

*Plaintiff*,

v.

**BOATS GROUP, LLC**,

*Defendant*.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff Brill Maritime, Inc. d/b/a Export Yacht Sales ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, brings this action against Boats Group, LLC ("Boats Group"), and complains and alleges as follows.[1]

[1] This Amended Complaint is filed in response to the Court's June 16, 2026, Order granting Boats Group's motion to dismiss the original Complaint, [ECF No. 84], and directly addresses the deficiencies identified by the Court. As the Court held, Plaintiff has already plausibly alleged the first element of its Section 2 monopolization claim—a relevant market and Boats Group's possession of monopoly power within it. *See* [ECF No. 84], at 5-12. The Court concluded, however, that the original Complaint lacked sufficient factual matter establishing the second element: willful acquisition or maintenance of that power through exclusionary conduct, as opposed to lawful growth attributable to a superior product, business acumen, or historic accident. *See id.* at 12-21.

This Amended Complaint cures that pleading deficiency by adding detailed factual allegations demonstrating that Boats Group pursued an *intentional* strategy of acquiring competitors and engaging in other conduct specified herein, not to improve its products or compete on the merits, but rather to eliminate competitive threats and entrench its market dominance. Specifically, these amendments show that Boats Group acquired competitors with the stated objective of preventing competition, discontinued competing products following those acquisitions, and implemented an overall strategy of eliminating, rather than competing against, rivals. As a direct result of this exclusionary conduct, Boats Group succeeded in its strategy to control the market and was able to raise membership prices for all customers and require members to purchase additional Boats Group services that they otherwise would not have been forced to purchase. The Amended Complaint therefore alleges "the acquisitions *themselves*," along with the other alleged conduct, "had an 'anticompetitive effect'" and that "Boats

## I. NATURE OF THE ACTION

1. This is an action for injunctive relief and damages for antitrust violations pursuant to the Sherman Act, 15 U.S.C. § 2 and the Florida Antitrust Act of 1980, Sections 542.19 and 542.23, Florida Statutes, and for unfair methods of competition under the Florida Deceptive and Unfair Trade Practices Act, 501.201, *et seq.* Specifically, Plaintiff seeks to restrain and remedy Boats Group's unlawful monopolization, maintenance of monopolization, and/or attempted monopolization of the U.S. boat listing and marketing services market.

2. Boats Group owns and operates the three largest online platforms that connect buyers and sellers of recreational boats in the U.S.: Boat Trader, YachtWorld, and boats.com. These platforms are used by boat brokerages and dealers to advertise and sell recreational vessels to consumers. Through subscription-based packages and add-on listing and marketing services, sellers pay Boats Group to have their inventory listed and marketed to a broad audience of prospective buyers.

3. Plaintiff is a Miami-based boat brokerage that purchases these subscriptions and additional services from Boats Group to market its inventory to potential buyers. Boats Group has willfully acquired, maintained and expanded monopoly power in this market by engaging in exclusionary and anticompetitive conduct, including the serial acquisitions of its direct competitors and coercive sales practices, that hinder entry and expansion by rival platforms. As a result, competitors are eliminated from the relevant market or otherwise foreclosed from competing on the merits, and boat brokerages and dealers face supracompetitive outreach costs and diminished quality in listing and marketing services, while consumers encounter reduced choice and higher prices in the recreational boating marketplace.

---

Group made those acquisitions … out of a desire to engage in exclusionary conduct or to gain monopoly power." *Id.* at 15. The acquisitions and other conduct alleged herein therefore "harm[ed] the competitive *process* and thereby harm[ed] consumers" in violation of Section 2. *Id.* at 14.

4. Plaintiff has been directly harmed by Boats Group's conduct. Like other brokerages and dealers, Plaintiff has been forced to pay supracompetitive prices for essential marketing services, with effectively zero viable alternatives available. Boats Group's exclusionary behavior has suppressed competition, harmed sellers and brokerages, and distorted the structure and dynamics of the online boat sales marketplace. Plaintiff brings this action, individually and on behalf of all others similarly situated, to enjoin Boats Group's unlawful conduct, restore competitive conditions in the relevant market, and recover treble damages for the injuries it has suffered, including overcharges, restricted choice, and artificially constrained market conditions that directly impacted Plaintiff and members of the Classes as subscribers and users of Boats Group's services.

## II. THE PARTIES

5. Plaintiff is a boat brokerage firm headquartered in Miami, Florida. Plaintiff is engaged in the business of marketing and selling recreational marine vessels and relies heavily on digital platforms to advertise its inventory to prospective buyers. Plaintiff has purchased subscription-based marketing services from Boats Group and has been directly harmed by Boats Group's anticompetitive conduct, as set forth below.

6. Defendant, Boats Group, is a limited liability company headquartered at 1221 Brickell Avenue, Suite 2300, Miami, Florida 33131. Boats Group owns and operates several of the most widely used online platforms for boat and yacht listings, including Boat Trader, YachtWorld, and boats.com, which formerly competed with one another in the market for online marine vessel listing and marketing services. These platforms serve as critical advertising and lead-generation tools for boat brokerages, dealers, and other sellers throughout the U.S. In January 2021, Boats Group was acquired by Permira Holdings Limited ("Permira"), a private equity group based in the U.K.

## III. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, because this action arises under the antitrust laws of the United States, including, specifically, Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

8. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims in this action in that they form part of the same case or controversy under Article III of the Constitution. The state law claims arise from the same nucleus of operative facts and involve overlapping factual and legal issues.

9. Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391, because Defendant is headquartered in this District, is licensed to do business, transacts business, or has committed acts in furtherance of the alleged conduct in this District; and because a substantial part of the events giving rise to the claims in this action occurred in this District.

10. This Court has personal jurisdiction over the Defendant because, *inter alia*, Defendant: (a) conducted substantial business in the U.S. and in this District, directly or through subsidiaries, agents, or affiliates; (b) Defendant purposefully directed its business activities at this forum, including marketing, selling, and providing online boat listing services to brokerages and consumers located in this District; (c) the unlawful conduct alleged herein was foreseeable and intended to have anticompetitive effects in this District; and (d) the claims in this action arise out of and relate to Defendant's contacts with the United States and with this forum.

11. Personal jurisdiction is also proper under Rule 4(k) of the Federal Rules of Civil Procedure and 15 U.S.C. § 22, which authorize service of process and the exercise of personal

jurisdiction in antitrust cases in any district where a Defendant resides, is found, has an agent, or transacts business.

## IV. FACTUAL ALLEGATIONS

### A. The Relevant Market

12. *Geographic Market.* The relevant geographic market is the United States. Boats Group's platforms are marketed, operated, and used by sellers and buyers nationwide. Plaintiff and other brokerage firms rely on access to buyers throughout the U.S., and Boats Group's conduct affects competition on a national scale.

13. *Product Market.* The relevant product market in this action is the market for online marine vessel listing and marketing services. This market comprises digital platforms that facilitate the professional listing, promotion, and sale of recreational boats and yachts, primarily serving licensed brokers and dealers. These platforms provide a suite of specialized tools, including advertising, marine-specific inventory management systems, integration with multiple listing services (MLS), customized sales presentation tools, contract drafting capabilities, and buyer analytics. These services are not reasonably interchangeable with general-purpose advertising or listing platforms, and they are necessary for effectively reaching and transacting with buyers in a fragmented and geographically dispersed market.

14. This product market exhibits the characteristics of a two-sided market, where the platform simultaneously serves two distinct but interdependent groups: sellers (*i.e.*, brokers and dealers) and buyers of marine vessels. As recognized in antitrust economics and jurisprudence, two-sided platforms are defined by network effects, that is, the value of the platform to one side increases as participation on the other side grows. In the market for online marine vessel listing and marketing services, sellers are drawn to platforms with large pools of active and qualified buyers, while buyers benefit from access to a wide and diverse set of listings curated and maintained by professional brokers.

These indirect network effects amplify platform scale advantages and can result in high barriers to entry and durable market power.

15. There are no reasonable substitutes for online marine vessel listing and marketing services as defined in this market. Traditional advertising channels, such as newspapers or boating magazines, are not effective alternatives, as they lack the reach, interactivity, and buyer targeting that online platforms provide. General online marketplaces (*e.g.*, Craigslist or Facebook Marketplace), or private broker websites are also not adequate substitutes, as they do not offer the professional-grade functionalities or visibility required by commercial sellers.

**B. Market Power**

16. *Market Power*. Boats Group controls a dominant share of the U.S. market for online boat listing and marketing services, operating the three largest online platforms used by brokerages and dealers to list and market recreational marine vessels. Boats Group publicly claims to hold approximately 75% of the global market for such services. While that figure encompasses international operations, Boats Group owns and operates the leading platforms used by U.S.-based boat brokerages and sellers, and no comparable U.S.-based competitors operate at a similar scale or reach.

17. Boats Group's share of the U.S. market is believed to be similarly high, if not greater, than its global share, and sufficient to confer monopoly power in the relevant geographic market. The International Yacht Brokers Association ("IYBA") is the marine industry's largest yacht brokerage association. Notably, 89.5% of Florida-based brokers that are IYBA members and actively selling boats through online marketing have used Boats Group's platforms.

18. Boats Group's internal documents confirm its monopoly share of the U.S market. [redacted]

[redacted]

19. This dominance has enabled Boats Group's predatory conduct to persist over time, allowing it to impose supracompetitive prices for subscription-based listing and marketing services without losing significant business to rivals, restrict sellers' ability to switch to alternative services, and foreclose entry and expansion by rival platforms.

20. Sellers who wish to remain competitive have no commercially viable alternative to using Boats Group's services and platforms. From interviews with customers and analyses by independent consultants, [redacted]

21. *High Barriers to Entry.* The U.S. market for online boat listing and marketing services is entrenched with significant and multifaceted barriers to entry. These barriers are both structural and strategic, and they enable Boats Group to preserve its monopoly power and foreclose competition.

22. Entry into this market requires substantial upfront capital investment. A new entrant must develop a technologically sophisticated platform, implement and integrate secure and scalable data infrastructure and payment systems, deliver a robust user interface capable of managing complex recreational vessel listings and transactions, and invest in search engine optimization and social media strategies. These technical demands alone present a formidable deterrent to new market participants.

23. In addition, Boats Group benefits from overwhelming brand recognition and consumer trust through its longstanding control over the industry's most established platforms, Boat Trader, YachtWorld, and boats.com. These platforms are widely recognized as synonymous with online boat sales in the U.S. Buyers and sellers disproportionately prefer them, creating a substantial reputational barrier that new entrants cannot easily overcome.

24. The market is further insulated by strong network effects, a structural feature common to two-sided digital platforms. In such markets, the utility of the platform to one group of users, such as marine brokers and dealers, is directly correlated with the level of participation by users on the other side of the platform, namely, buyers of marine vessels. Sellers are more likely to use a platform with a large and active pool of buyers, while buyers are drawn to platforms offering the broadest selection of listings from reputable sellers. This interdependence reinforces Boats Group's dominance and discourages users from switching to alternative platforms with less traffic or inventory.

25. Boats Group derives a significant competitive advantage from these indirect network effects, which operate as a persistent barrier to entry. Sellers are incentivized to list inventory where buyer traffic is highest, and buyers are drawn to platforms with the broadest and most diverse selection of listings. This two-sided dynamic creates a self-reinforcing cycle that locks in Boats Group's dominance and prevents new entrants from achieving critical mass. Platforms lacking an existing user base struggle to gain listings or traffic, making it virtually impossible to scale.

26. As Dr. Fiona Scott Morton, Professor of Economics at Yale University, explained in testimony before the House Subcommittee on Antitrust:

> Digital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach. All of these attributes together tend to generate concentrated markets, or market structures containing few firms. With the addition of inertial (or "sticky") consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition.
>
> The harms from insufficient competition appear in prices that are higher than competitive prices, quality that is lower than competitive quality, and less innovation than consumers would benefit from in competitive markets.[2]

27. Boats Group's internal assessments and analyses by third party consultants confirm these barriers to entry serve to protect Boats Group's monopoly market share. [redacted]

28. In this context, Boats Group has substantially foreclosed access to essential competitive inputs (listings and traffic), raised rivals' costs, denied competitors the scale necessary to challenge Boats Group, and harmed consumers by stifling competition on price, service, and innovation.

---

[2] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf (last visited June 30, 2026).

29. For example, in 2020, OneWater Marine, one of the largest boat retailers in the U.S., launched boatsforsale.com, a competing online marketplace for new and pre-owned boats, as well as financing for the purchase of boats. [redacted] Though "boats for sale" was "one of the top search phrases when shopping for a boat," and OneWater Marine was one of the largest U.S. retailers of boats, this potential competitor was foreclosed from successfully entering the relevant market and competing with Boats Group.[3] Boatsforsale.com could never obtain meaningful market share, and OneWater Marine dispensed with the platform in 2025. The IYBA[4] similarly launched an alternative platform, *Yachtr*, in 2024 in direct response to Boats Group's escalating and anticompetitive pricing. Despite IYBA's institutional backing and market familiarity, *Yachtr* has struggled to gain listings and user traffic due to the industry's high barriers to entry and due to Boats Group's entrenched dominance and strong network effects. *Yachtr*'s inability to compete with Boat Group's platforms demonstrates the high barriers facing new entrants in the relevant geographic and product markets.

**C. Anticompetitive Conduct**

***1. Boats Group obtained monopoly power through the acquisitions of YachtWorld and boats.com.***

30. Boats Group's path to dominance in the U.S. online marine vessel listing and marketing services market began with a series of exclusionary acquisitions that systematically eliminated meaningful competition. The foundation was laid when Trader Publishing Company owned and

[3] Press Release, OneWater Marine, OneWater Marine Inc. Expands Its Digital Platform with the Purchase of Boatsforsale.com (Aug. 24, 2020), https://investor.onewatermarine.com/news/news-details/2020/OneWater-Marine-Inc.-Expands-its-Digital-Platform-with-the-Purchase-of-Boatsforsale.com-08-24-2020/default.aspx (last visited June 30, 2026).

[4] Boats Group, through its Chief Brand & Communications Officer, is an active affiliate member of the IYBA. Plaintiff is also an active member of IYBA, but does not use the *Yachtr* platform.

operated Boat Trader, the largest online boating marketplace in the U.S. In 2004, Trader Publishing Company consolidated control of the industry by acquiring two of its main competitors, YachtWorld.com and boats.com, bringing all three major players under common ownership and substantially reducing competition in the relevant market. Dominion Marine Media succeeded to Trader Publishing Company in July 2016 and later rebranded as Boats Group.

31. Produced in discovery, Boats Group's "highly confidential" internal documents make clear that the purpose of the YachtWorld and boats.com acquisitions was to eliminate competition. Those documents note [redacted] Boats Group's acquisition of Boat Trader, YachtWorld and boats.com succeeded in extinguishing the competitive threats from the former rivals as, not surprisingly, once the competing platforms were under common ownership, [redacted]

32. [redacted] These acquisitions yielded monopoly power to Boats Group, as Boats Group intended. Following the consolidation, Boats Group celebrated in "highly confidential" internal documents, [redacted]

### *2. Boats Group recognized that embedding itself throughout the sales process was critical to maintaining its monopoly power through network effects.*

33. [redacted]

[redacted]

34. Listings are the foremost engine of Boats Group's network effects: more listings draw more buyers, which draws more sellers and more transaction data, which in turn makes Boats Group's listings more valuable. Each acquisition that captured a source of listings, transactions, or sales data fed that cycle and raised the barrier to any rival's entry.

35. [redacted]

36. [redacted]

[redacted]

37. [redacted]

38. [redacted]

[redacted]

39. [redacted]

40. [redacted]

*3. In late 2016, Boats Group acquired its next most credible competitor, YachtCloser, to eliminate competition and maintain its monopoly power.*

41. In 2016, Boats Group encountered its "1st credible competitor" since it obtained monopoly power: YachtCloser, an eDocumentation provider of standardized contracts and closing tools. [Tugboat Update, Mar. 23, 2016.][5] Rather than compete with YachtCloser on the merits, Boats Group acquired and integrated it.

42. Before acquiring YachtCloser, Boats Group attempted to build a competing product. In or about March 2016, Boats Group launched an internal initiative it code-named "Project Tugboat,"

[5] In 2020, Boats Group was sued for breach of contract in state court. *See Verihull LLC d/b/a Boat History Report v. Boats Group, LLC*, Case No. 2019-006963-CA-01 (Fla. 11th Cir. Ct.). On July 27, 2022, certain depositions and documents from that litigation were publicly filed for the first time, including the testimony and non-Bates-labeled documents referenced by Plaintiff herein. *See id.* Plaintiff discovered these publicly filed, previously confidential, materials for the first time after it filed its initial Complaint in this action.

which its own meeting minutes describe as "a response to Yacht Closer." Boats Group directed that the "Tugboat MVP [(minimum viable product)] needs to be 1% better than Yacht Closer." [Tugboat Update, Mar. 23, 2016.]

43. Boats Group recognized, however, that YachtCloser was not confined to ancillary closing services, but was expanding toward Boats Group's core listing business. Boats Group's corporate representative admitted that YachtCloser was "starting to make . . . inroads into developing websites" for brokers and that Boats Group had an "inkling that they might try to . . . develop and market an MLS type of product"—a multiple-listing service of the same kind Boats Group offers through its YachtWorld, Boat Trader, and boats.com memberships. Boats Group considered YachtCloser "more of a threat than anything else." [Deposition of Ervin James Selzer as Corporate Representative of Boats Group, LLC ("Selzer Dep.") at 151:13-20.]

44. [redacted]

45. In November 2016, YachtCloser publicly announced the launch of YachtSpring.com, which it described as "the purest MLS for brokerage boats" and "the only MLS integrated with actual seller listing agreements," carrying "the most accurate and up-to-date listings on the market." [Int'l Yacht Brokers Ass'n Newsletter (Dec. 2016).] YachtCloser's MLS competed directly with YachtWorld, Boat Trader, and boats.com in the relevant market for online marine vessel listing and marketing services, as Boats Group had previously recognized. YachtCloser's announcement also touted an

accompanying "Sold Boat Intelligence platform" offering "real" sold-boat data, trends, and analytics — a product competing directly with Boats Group's SoldBoats product.

46. Boats Group acquired YachtCloser on or about January 10, 2017, weeks after this launch.

47. [redacted]

48. [redacted]

49. [redacted]

50. [redacted]

51. [redacted]

[redacted]

52. [redacted]

53. [redacted]

54. [redacted]

55. Ian Atkins, Boats Group's former CEO, explained under oath that the competitive threat posed by YachtCloser made Boats Group "very nervous," and Boats Group "believed that [it] should acquired YachtCloser to – to avoid the competitive threat." [Deposition of Ian Atkins, as Corporate Representative of Boats Group, LLC ("Atkins Dep.") at 99:3-16.]

56. Thus, rather than complete Project Tugboat and compete on the merits, Boats Group acquired YachtCloser on or about January 10, 2017, and folded it into its own product suite. The acquisition eliminated the only competitor Boats Group had itself identified as "credible" and removed the company best positioned to break into the market's self-reinforcing network-effects cycle. Boats Group took these actions not as an exercise of business acumen, but with the purpose and effect of eliminating a nascent competitor and maintaining Boats Group's monopoly in the relevant market.

57. Having acquired the competitor it had identified as its greatest threat, Boats Group promptly eliminated YachtCloser's competing listing product. On January 27, 2017 — just over two weeks after the acquisition closed — Boats Group informed YachtCloser's customers that "YachtSpring.com will be sunsetted." [YachtCloser/YachtWorld Integration Announcement (Jan. 27, 2017).] Boats Group thereby removed from the market the only independent multiple-listing service then competing with YachtWorld, Boat Trader, and boats.com — confirming that the purpose and effect of the acquisition was to eliminate competition in the relevant market, not to compete on the merits.

58. YachtCloser was a growing, durable competitor, not a failing firm. Its co-founder testified that YachtCloser operated for nearly four years "without losing a single customer," that its product was "very sticky," and that customer churn increased only "after the acquisition" by Boats Group. [Deposition of Brad Parker ("Parker Dep.") at 138:4-23.] YachtCloser also competed aggressively on price, offering its core service for approximately $60 per month under a deliberately

"low-cost, high-value" model. [*Id.* at 124:22-125:17.] By acquiring and absorbing YachtCloser, Boats Group removed this price and quality competition from the relevant market.

59. Boats Group has admitted under oath that the relevant market is protected by network effects that make entry exceptionally difficult. Its corporate representative testified that in this market "listing begets consumers coming into your site that then begets more listings," a dynamic he described as "circular," such that "once you have a certain mass, it makes it hard for somebody to . . . break into that . . . cycle," with the result that there "wasn't a significant competitor that really had gained much from . . . a listings perspective." [Selzer Dep. at 150:13-151:12.] Against this backdrop, Boats Group's acquisition of the one emerging competitor harmed the competitive process itself: it foreclosed the entry that network effects already made difficult and deprived the market of competition on price, quality, and innovation.

60. The anticompetitive purpose of Boats Group's conduct—including Project Tugboat and the decision to acquire rather than compete with YachtCloser—was documented only in internal, non-public materials. Plaintiff neither knew nor, in the exercise of reasonable diligence, could have known of that purpose until those materials were disclosed in litigation. Boats Group's confidential strategy to kill, rather than compete with, the competition paid off. [redacted]

*4. In 2021, Boats Group executed its anticompetitive acquisition strategy to eliminate competition posed by Trident Financial, LLC.*

61. Boats Group's maintenance of its monopoly is ongoing. Within the four years preceding the filing of this action, Boats Group has committed overt acts that maintain its monopoly and inflict fresh, independent injury on Plaintiff and the Classes, including the exclusionary acquisition

of additional competitors and conditioning access to its dominant listing platforms on the purchase of additional listing and marketing services.

62. In 2021, Boats Group again chose to buy rather than out-compete an emerging rival, acquiring Trident Financial, LLC ("Trident"). [redacted]

63. [redacted]

64. [redacted]

[redacted]

65. But as Boats Group admitted in its "highly confidential" internal documents, [redacted] Thus, on November 3, 2021, Boats Group closed on its acquisition of Trident.

66. [redacted]

67. [redacted]

[redacted]

68. [redacted]

69. [redacted]

70. [redacted]

*5. Boats Group continues to target elimination of nascent competitors to maintain its monopoly in the relevant market.*

71. Meanwhile, Boats Group continues to target nascent competitors in the relevant market. Most recently, Boats Group set its cross-hairs on MarineSource, a "new entrant offering an AI-powered platform designed to improve efficiency, reduce costs, and increase access for both consumers and industry participants."[6] MarineSource launched its platform "to compete by offering a legitimate AI-driven alternative to Boats Group's legacy platforms" and has "established itself as a credible and emerging competitor in the online boating marketplace, attracting dealers, brokers, and other industry participants seeking additional options for listing and marketing vessels."[7] Rather than compete, "Boats Group responded to MarineSource's market entry by issuing a Cease and Desist Letter on October 22, 2025, and thereafter filed a lawsuit alleging that MarineSource was improperly 'scraping' listings and data from Boats Group's websites" by "access[ing an] Authenticated Account, deploy[ing] an automated bot, and scrap[ing] hundreds of thousands of listings from [Boats Group's] platform[s]."[8] But according to Marine Source, Boats Group knows that its scraping allegations are without merit, because the premise of its Boats Group's suit is "technically impossible." [9]

---

[6] Defs.' Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj., *Boats Group, LLC v. MarineSource, Inc. et al.*, Case No. 2026-006732-CA-01 (Fl. 11th Cir. Ct.), at 3-4.

[7] *Id.* at 4.

[8] *Id.*

[9] *Id.* at 5.

72. Boats Group's Chief Technology Officer confirmed that Boats Group's platforms are "controlled and actively monitored," and Boats Group's "bot-detection protocols and anomaly-detection systems" would identify and block any scraping activity by MarineSource.[10] Indeed, the "alleged authenticated scraping involved approximately 20 terabytes of data—the equivalent of tens of millions of photographs or more than a year of continuous video."[11] "Conduct of that magnitude could not have gone unlogged," yet according to documents filed in the MarineSource litigation, not "a single alert was generated, a single log entry . . . created, or a single security event . . . triggered" Boats Group's security safeguards.[12]

73. The allegations underlying Boats Group's suit against its competitor MarineSource are therefore objectively baseless. As MarineSource rightly observed, Boats Group filed the suit "not [as] a response to genuine misconduct," but as "an effort by a dominant market participant to use extraordinary judicial relief to hobble a legitimate new competitor" and eliminate competition in its core market—online listing and marketing services for recreational marine vessels.[13]

**D. Anticompetitive Effects and Harm**

74. Boats Group's supracompetitive prices are not, standing alone, the gravamen of Plaintiff's claim; they are the direct consequence of the anticompetitive conduct alleged above. Having eliminated competition between Boat Trader, YachtWorld, and Boats.com; having killed off new competition and other threats to its market share through acquisitions of YachtCloser and Trident; having further expanded its market share through coercive sales practices; and having entrenched the barriers to entry it has admitted exist, Boats Group has been able to abuse its monopoly power and

[10] *Id.* at 5.
[11] *Id.* at 5-6.
[12] *Id.* at 6.
[13] *Id.* at 3.

impose the sustained price increases described below without losing customers and without competitive constraint.

75. Boats Group hid much of the anticompetitive nature of this conduct from disclosure—and from Plaintiff—until very recently. At the time of their consummation, Boats Group publicly characterized the acquisitions of YachtWorld, boats.com, and YachtCloser as strategic, increasing "value" to its customers.[14] As a result, Plaintiff could not allege that the transactions were part of an anticompetitive scheme at the time of the acquisitions.[15] Recently disclosed "highly confidential" internal documents and deposition testimony reveal for the first time the anticompetitive effect of the acquisitions in Boats Group's desire to eliminate competition in the relevant market and gain monopoly power. Boats Group kept concealed, *inter alia*, that:

a. [redacted]

b. [redacted]

c. [redacted]

---

[14] *See, e.g.*, Press Release, Dominion Marine Media, Dominion Marine Media Acquires YachtCloser (Jan. 27, 2017), https://www.yachtcloser.com/blog/dominion-marine-media-acquires-yachtcloser/ (last accessed June 30, 2026); Press Release, Trader Publishing Company, Trader Acquires boats.com and yachtworld.com (Sep. 28, 2004), https://www.boats.com/on-the-water/trader-acquires-boatscom-and-yachtworldcom/ (last accessed June 30, 2026).

[15] *See, e.g.*, [ECF No. 84] at 15.

d. [redacted]

e. [redacted]

f. [redacted]

g. Boats Group was "very nervous about" YachtCloser's MLS and "believed that [Boats Group] should acquire YachtCloser to – to avoid the competitive threat" [Atkins Dep. at 99:3-16];

h. Boats Group considered YachtCloser "more of a threat than anything else" [Selzer Dep. at 151:13-20];

i. [redacted]

76. Having achieved market dominance through these acquisitions—the anticompetitive nature of which Boats Group has concealed—and through the other more recent anticompetitive conduct alleged herein, Boats Group obtained, maintained, and abused monopoly power to impose steep and sustained price increases on its customer base. In 2014, Plaintiff's combined monthly cost of listing on Boat Trader and YachtWorld was approximately $1,004. By 2017, these prices rose to $1,221. Between 2018 and 2024, pricing surged again, reaching $2,794 in 2021 and $5,128 by 2024, a more than 400% increase over a decade. In 2025, Boat Trader alone charged $2,900 per month for its services.

77. These supracompetitive prices are not the result of improved quality or innovation to Boats Group's listing platforms, but rather a reflection of Boats Group's ability to unilaterally raise prices due to the lessened competition and increased market power perfected by its anticompetitive conduct. [redacted] Boats Group's ability to impose supracompetitive price increases constitutes ongoing anticompetitive harm resulting from Boats Group's continued anticompetitive conduct, including its serial elimination of competition and abuse of monopoly power.

78. The anticompetitive effects of Boats Group's conduct extends beyond its ability to impose steep supracompetitive price increases on its customers. Boats Group's products have declined in quality, too, and industry participants have voiced concerns about this disconnect between price and value. For example, Maryline Bossar of ACY Yachts in Maryland noted that "lead generation [is] staying flat" despite rising fees and described the price hikes as "unacceptable." [redacted]

[redacted]

79. Boats Group's conduct imposes the additional anticompetitive effect of reduced choice for customers. [redacted]

80. Boats Group's anticompetitive conduct is particularly harmful in a market protected by high structural barriers to entry, including significant capital costs, entrenched brand preferences, and powerful network effects. These conditions make it exceptionally difficult for new entrants to challenge Boats Group's dominance, foreclosing rivals from accessing the inventory and user scale needed to compete and deterring market entry. OneWater Marine's potential competitor platform, boatsforsale.com, launched in 2020, and IYBA's potential competitor platform, *Yachtr*, launched in 2024, provide clear examples. Despite institutional support from the yacht brokers themselves and market recognition, these products failed to gain traction due to Boats Group's monopoly power, entrenched scale, and strong network effects. This failure underscores how Boats Group's conduct, not just market dynamics, prevents the emergence of meaningful competition.

81. Boats Group's conduct, including its serial acquisitions to protect its [redacted] and eliminate competition, its [redacted] through coerced purchases of additional services and products, and its exploitation of structural entry barriers constitutes monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Florida

Statutes § 542.19. Boats Group has willfully maintained and expanded its monopoly power through exclusionary practices rather than competition on the merits. This conduct has enabled Boats Group to obtain and preserve its monopoly power not through superior products or services, but through tactics that suppress competition, reduce entry and innovation, and harm sellers and consumers.

## V. CLASS ACTION ALLEGATIONS

82. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of itself and a class of direct purchasers seeking injunctive and declaratory relief (the "Nationwide Class"), defined as:

> All persons and entities in the United States who purchased subscription-based marketing and listing services from Boats Group between August 14, 2021, and the present, and who suffered damages as a result of Boats Group's anticompetitive conduct.

83. Plaintiff also brings this under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of itself and a class of direct purchasers seeking damages and related equitable relief (the "Florida Class"), defined as:

> All persons and entities in Florida who purchased subscription-based marketing and listing services from Boats Group between August 14, 2021, and the present, and who suffered damages as a result of Boats Group's anticompetitive conduct.

84. Excluded from these Nationwide Class and the Florida Class (collectively, the "Classes") are Defendant and its officers, directors, or employees; any entity in which Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any such excluded party; any federal, state, or local governmental entities; any judicial officer presiding over this action and members of his/her immediate family and judicial staff; any juror assigned to this case; and any business majority-owned by any such person.

85. The members of the Classes are so numerous that joinder is impracticable. While the exact number of Class members is unknown, Plaintiff believes, based on market structure and publicly

available data, that there are thousands of members of the Nationwide and Florida Classes. Class membership can be ascertained through objective criteria using Defendant's business and sales records.

86. There are questions of law and fact common to the Classes, the resolution of which will drive the litigation and predominate over any individual issues. These common questions include, but are not limited to:

a. Whether Boats Group engaged in exclusionary or anticompetitive conduct in violation of federal and/or state antitrust laws;

b. Whether Boats Group's conduct led to the acquisition, maintenance, or abuse of monopoly power in the market for online boat listing and marketing services;

c. Whether Boats Group's conduct resulted in supracompetitive pricing for such services;

d. Whether Plaintiffs and Class members suffered antitrust injury as a result of the conduct alleged;

e. The nature and extent of class-wide damages; and

f. Whether injunctive and equitable relief is appropriate.

87. Plaintiff's claims are typical of the claims of members of the Classes. Plaintiff and Class members purchased subscription-based marketing services from Boats Group and were similarly harmed by the same anticompetitive conduct. Plaintiff's claims arise from the same course of conduct as those of other Class members.

88. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has no conflicts of interest with other Class members and has retained counsel experienced in complex litigation, including class actions.

89. The questions of law and fact common to the Classes predominate over any questions affecting only individual members. Class-wide issues, including the nature of Boats Group's conduct, the existence of market power, and the effect on prices, will determine liability and damages.

90. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The prosecution of separate actions by individual Class members would risk inconsistent or varying adjudications and would impose unnecessary burden and expense. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

91. Plaintiff knows of no material obstacles to maintaining this action as a class action under Federal Rule of Civil Procedure 23.

## VI. ANTITRUST INJURY AND STANDING

92. Plaintiff and members of the Classes have suffered, and will continue to suffer, antitrust injury as a direct and proximate result of Boats Group's unlawful acquisition, maintenance, and exercise of monopoly power in the market for online marine vessel listing and marketing services in the U.S.

93. As direct purchasers of Boats Group's subscription-based listing and marketing services, Plaintiff and members of the Classes have paid prices substantially above those that would prevail in a competitive market. These overcharges constitute a clear and quantifiable form of economic harm. Plaintiff and members of the Classes were also deprived of the benefits of effective competition, including competitive pricing, increased output, improved quality, and meaningful platform choice.

94. Buyers of marine vessels have likewise sustained antitrust injury as a consequence of Boats Group's exclusionary conduct. The supracompetitive fees imposed on brokers and dealers are passed through to buyers in the form of higher prices. Moreover, as seller participation is diminished by rising costs and lack of viable alternatives, buyers face a reduction in available inventory, geographic

limitations, and impaired access to critical listing information. Boats Group's manipulation of listing visibility and platform functionality further distorts buyer outcomes and impairs market efficiency.

95. These injuries are the direct, foreseeable, and proximate result of Boats Group's unlawful conduct, including but not limited to its exclusionary acquisitions, restrictive contractual provisions, and sustained imposition of inflated pricing. The resulting harm is not limited to individual market participants but constitutes injury to the competitive process itself.

96. Plaintiff and members of the Classes have antitrust standing to assert claims under federal law. The injuries alleged are of the type the antitrust laws were designed to prevent, are traceable to Boats Group's anticompetitive conduct, and are capable of measurement through established and accepted economic methodologies.

## VII. CLAIMS FOR RELIEF

### COUNT I
### MONOPOLIZATION:
### VIOLATION OF SHERMAN ACT SECTION 2
### (ON BEHALF OF NATIONWIDE CLASS)

97. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 96 above.

98. Boats Group possesses monopoly power in the relevant market for online boat listing and marketing services in the U.S as demonstrated by its power to unilaterally set supracompetitive prices and Boats Group's dominant market share.

99. Boats Group has publicly claimed to hold 75% of the global market for such services, and it controls the dominant platforms used by U.S.-based brokers and sellers, including Boat Trader, YachtWorld, and boats.com. Based on its control of these platforms and lack of meaningful competition at scale, Boats Group's U.S. market share is reasonably inferred to be similarly dominant. In Florida, 89.5% of brokers who are IYBA members and actively selling boats through online marketing have used Boats Group's platforms, further supporting this inference.

100. Boats Group has willfully maintained its monopoly power through predatory and exclusionary conduct, and not as a consequence of a superior product, business acumen, or historic accident. As alleged above, Boats Group identified YachtCloser as [redacted] and the [redacted] chose to acquire that competitor rather than compete with it on the merits, for the stated purpose of [redacted] and, upon acquiring YachtCloser, sunsetted its competing YachtSpring platform—removing from the market the only independent multiple-listing service then competing with YachtWorld, Boat Trader, and boats.com.

101. As alleged above, Boats Group entrenched its monopoly position through a series of exclusionary acquisitions that eliminated its largest competitors, enabled it to impose sustained supracompetitive pricing, and facilitated its use of exclusive dealing provisions that foreclose competitors from accessing necessary inventory and scale.

102. Boats Group's conduct harmed the competitive process, not merely individual competitors. By eliminating the only emerging competitor in a market Boats Group admits is protected by self-reinforcing network effects and high barriers to entry, Boats Group foreclosed competition that would otherwise have constrained its prices, expanded output, and spurred innovation, and deprived brokers, dealers, and consumers of a lower-priced, independent alternative.

103. Boats Group has further maintained its monopoly by tying its must-have listing platforms to its acquired and ancillary products, including YachtCloser and BoatWizard, foreclosing rivals from the scale and data necessary to compete and, in Boats Group's own words, making it [redacted]

104. Boats Group's supracompetitive prices are the direct consequence of this exclusionary conduct. Freed from the competitive constraint that an independent YachtCloser and YachtSpring

would have imposed, Boats Group has raised prices steeply and repeatedly—without losing customers and without corresponding improvements in quality, service, or innovation.

105. Boats Group's conduct lacks any legitimate procompetitive justification. Any asserted efficiencies are outweighed by the anticompetitive effects, including inflated prices, reduced innovation, suppressed market entry, and diminished customer choice.

106. Boats Group's actions constitute unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

107. As a direct and proximate result of Boats Group's unlawful conduct, Plaintiff and members of the Classes have suffered injury to their business and property, including paying inflated subscription fees and being denied the benefits of a competitive market. Plaintiff and the Classes are entitled to treble damages, costs of suit, and reasonable attorney's fees, pursuant to 15 U.S.C. § 15.

108. Unless enjoined, Boats Group's conduct will continue to cause irreparable harm for which there is no adequate remedy at law. Plaintiff and the Classes are entitled to injunctive relief pursuant to 15 U.S.C. § 26.

## COUNT II
## ATTEMPTED MONOPOLIZATION:
## VIOLATION OF SHERMAN ACT SECTION 2
## (ON BEHALF OF NATIONWIDE CLASS)

109. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 96 above.

110. Boats Group has engaged in predatory and anticompetitive conduct—including its acquisition of YachtCloser to eliminate a nascent competitor, the sunsetting of the competing YachtSpring platform, and the tying of its listing platforms to its ancillary products—with the specific intent to acquire, maintain, and expand monopoly power in the market for online boat listing and marketing services in the U.S. That specific intent is established by Boats Group's own contemporaneous documents, which identify the acquisition's purpose as to [redacted]

[redacted] and which reflect a deliberate decision to acquire YachtCloser rather than build a competing product, so as to prevent YachtCloser from gaining the scale that would have made it [redacted]

111. Boats Group's conduct demonstrates a deliberate effort to suppress competition and fortify its dominance, not through innovation or competition on the merits, but through exclusionary tactics—including the acquisition and elimination of nascent competitors—that prevent market entry and foreclose rivals from scale and inventory.

112. Boats Group's current position in the market—including its control of the dominant platforms used by U.S. brokers, its publicly reported 75% global share, and the fact that 89.5% of Florida-based brokers who are IYBA members and actively selling boats through online marketing have used Boats Group's platforms—gives rise to, at a minimum, a dangerous probability of achieving or maintaining monopoly power in the relevant market. That probability is heightened by the high structural barriers to entry and network effects Boats Group has admitted exist, and by Boats Group's elimination of the only competitors positioned to encroach those barriers.

113. Boats Group's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

114. As a direct and proximate result of Boats Group's unlawful conduct, Plaintiff and members of the Classes have suffered injury to their business and property, including overcharges and the loss of meaningful competitive choice. Plaintiff and the Classes are entitled to treble damages, costs of suit, and reasonable attorneys' fees pursuant to 15 U.S.C. § 15.

115. Unless enjoined, Boats Group's unlawful conduct will continue to cause irreparable harm for which there is no adequate remedy at law. Plaintiff and the Classes are entitled to injunctive relief pursuant to 15 U.S.C. § 26.

**COUNT III**
**MONOPOLIZATION:**
**FLORIDA ANTITRUST LAW**
**(ON BEHALF OF FLORIDA CLASS)**

116. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 96 above.

117. Boats Group has willfully acquired, maintained, and expanded its monopoly power in the market for online marine vessel listing and marketing services in Florida through predatory and exclusionary conduct, and not through superior product, business acumen, or historic accident. As alleged above, Boats Group acquired YachtCloser—the competitor it identified as its [redacted]—rather than compete with it on the merits, sunsetted YachtCloser's competing YachtSpring listing platform, and tied its dominant listing platforms to its ancillary products, thereby foreclosing competition and harming the competitive process. Boats Group's resulting dominance is reflected in the fact that 89.5% of Florida-based brokers who are IYBA members and actively marketing boats online have used Boats Group's platforms, with no viable alternatives.

118. Boats Group's conduct constitutes monopolization in violation of the Florida Antitrust Act of 1980, Fla. Stat. § 542.19.

119. As a direct and proximate result of Boats Group's unlawful conduct, Plaintiff and members of the Florida Class have suffered injury to their business and property, including paying inflated subscription fees and being denied the benefits of a competitive market. Plaintiff and the Florida Class are entitled to treble damages, the costs of suit, and reasonable attorney's fees, pursuant to Fla. Stat. § 542.22.

120. Unless enjoined, Boats Group's conduct will continue to cause irreparable harm for which there is no adequate remedy at law. Plaintiff and the Florida Class are entitled to injunctive relief pursuant to Fla. Stat. § 542.23.

**COUNT IV**
**ATTEMPTED MONOPOLIZATION:**
**FLORIDA ANTITRUST LAW**
**(ON BEHALF OF FLORIDA CLASS)**

121. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 96 above.

122. Boats Group has engaged in predatory and anticompetitive conduct—including its acquisition of YachtCloser to eliminate a nascent competitor, the sunsetting of the competing YachtSpring platform, and the tying of its listing platforms to its ancillary products—with the specific intent to acquire, maintain, or expand monopoly power in the Florida market for online marine vessel listing and marketing services. That specific intent is established by Boats Group's own contemporaneous documents, which identify the acquisition's purpose as [redacted] This intent and effect are underscored by Boats Group's current dominance in the region, as evidenced by the fact that 89.5% of Florida-based brokers who are IYBA members and actively marketing boats online have used Boats Group's platforms.

123. Boats Group's conduct presents a dangerous probability of achieving or maintaining monopoly power in the relevant Florida market, particularly given the high structural barriers to entry and network effects Boats Group has admitted exist, the lack of viable alternatives for Florida-based brokers and buyers, and Boats Group's elimination of the one competitor positioned to overcome those barriers. This conduct constitutes attempted monopolization in violation of the Florida Antitrust Act of 1980, Fla. Stat. § 542.19.

124. As a direct and proximate result of Boats Group's unlawful conduct, Plaintiff and the Florida Class have suffered injury to their business and property, including overcharges and the loss of meaningful competitive choice. Plaintiff and the Florida Class are entitled to treble damages, costs of suit, and reasonable attorneys' fees pursuant to Fla. Stat. § 542.22.

125. Unless enjoined, Boats Group's conduct will continue to cause irreparable harm for which there is no adequate remedy at law. Plaintiff and the Florida Class are entitled to injunctive relief pursuant to Fla. Stat. § 542.23.

**COUNT V**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(ON BEHALF OF FLORIDA CLASS)**

126. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 96 above.

127. Boats Group has engaged in unfair methods of competition and/or unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.204(1).

128. Specifically, Boats Group's conduct—including its acquisition of YachtCloser to eliminate a nascent competitor, its sunsetting of the competing YachtSpring listing platform, [redacted]—constitutes an unfair method of competition within the meaning of FDUTPA. This conduct offends established public policy, is unethical or unscrupulous, and has caused or is likely to cause substantial injury to consumers and market participants that they could not reasonably avoid.

129. Boats Group's actions also qualify as deceptive practices to the extent they misled or obscured from customers the lack of meaningful competitive alternatives and the true nature of its pricing power in the market.

130. As a direct and proximate result of Boats Group's unlawful conduct, Plaintiff and members of the Classes have suffered actual damages, including overcharges for subscription-based marketing services and loss of the benefits of a competitive marketplace, in violation of Fla. Stat. § 501.211(2).

131. Plaintiff and the Classes are entitled to recover actual damages, attorneys' fees, and costs of suit as provided under Fla. Stat. § 501.2105.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and grant relief as follows:

1. Declare, find, adjudge, and decree that Boats Group has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, Florida Antitrust Law, Fla. Stat. § 542.19, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204, by engaging in unlawful monopolization and/or attempted monopolization;

2. Permanently enjoin Boats Group from engaging in the anticompetitive and exclusionary conduct described herein and require Boats Group to take affirmative actions necessary to restore competition in the relevant market;

3. Award treble damages to Plaintiff and the Classes pursuant to 15 U.S.C. § 15 and Fla. Stat. § 542.22, in an amount to be determined at trial, together with the costs of suit and reasonable attorneys' fees;

4. Award actual damages to Plaintiff and the Classes for Boats Group's violations of FDUTPA, pursuant to Fla. Stat. § 501.211(2), in an amount to be determined at trial;

5. Award attorneys' fees and costs under FDUTPA pursuant to Fla. Stat. § 501.2105;

6. Grant such other and further equitable or legal relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED June 30, 2026

Respectfully submitted,

**STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC**
Two South Biscayne Boulevard
Suite 1600
Miami, FL 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
Florida Bar No. 056140
tkolaya@sknlaw.com
MATTHEW DELLABETTA
Florida Bar No. 1031216
mdellabetta@sknlaw.com

-and-

**MILLER, THIBODEAUX, DYSART, VEITH & PASCHAL, LLC**
643 Magazine Street, Suite 405
New Orleans, LA 70130
Tel: (504) 977-9150

By: */s/ C. Hogan Paschal*
Kerry J. Miller, La. Bar. No. 24562
*(Pro Hac Vice)*
C. Hogan Paschal, La. Bar No. 38495
*(Pro Hac Vice)*
kmiller@mtdvp.com
hpaschal@mtdvp.com

***Attorneys for Plaintiff Brill Maritime, Inc. d/b/a Export Yacht Sales, individually and on behalf of all others similarly situated***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 30, 2026, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Timothy A. Kolaya*
TIMOTHY A. KOLAYA