**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-23663-ALTMAN/Lett**

**BRILL MARITIME, INC. d/b/a EXPORT YACHT SALES**, on behalf of itself and all others similarly situated,

*Plaintiff*,

v.

**BOATS GROUP, LLC**,

*Defendant*.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

Brill Maritime, Inc. d/b/a Export Yacht Sales ("Brill"), by and through its undersigned counsel, submits its Response in Opposition to Boats Group, LLC's ("Boats Group") Motion to Dismiss Plaintiff's First Amended Class Action Complaint [ECF No. 95] ("Motion" or "Mot."), and states:

**INTRODUCTION**

In dismissing Brill's initial Complaint, the Court identified precisely what was missing: allegations that Boats Group's conduct "had an 'anticompetitive effect' or that," when Boats Group acted, "it did so out of a desire to engage in exclusionary conduct or to gain monopoly power." [ECF No. 84] ("Order") at 15. The First Amended Complaint [ECF No. 88] ("FAC") supplies those missing allegations, not with "bald assertions" or "buzzwords," but with Boats Group's "highly confidential," previously concealed documents and sworn testimony. Those previously non-public materials show that Boats Group acquired, and continues to target, competing platforms with an express exclusionary purpose: [redacted][1] FAC ¶ 47. Those acquisitions comprised part of a [redacted] so that Boats Group could gain and maintain monopoly power. *Id.* ¶ 70. The result: lessened competition, higher prices, reduced output and diminished quality—each evidence of anticompetitive effect.

The Motion contends with none of Brill's new allegations. Boats Group: (1) ignores the FAC, insisting Brill "rehashes" "previously rejected" claims, though none of the allegations drawn from Boats Group's confidential materials appeared in the initial Complaint; (2) misstates the Order and the law, inventing requirements found nowhere in Section 2; and (3) manufactures fact issues, which cannot be resolved on the pleadings. The Motion should be denied.

**FACTUAL ALLEGATIONS**

Boats Group owns and operates Boat Trader, YachtWorld, and boats.com, which together account for [redacted] market share for online marine vessel listing and marketing services (the "Relevant Market"). FAC ¶¶ 12-29. The Court ruled previously those facts satsify the first element of Brill's Section 2 claim, possession of monopoly power in the Relevant Market. Order at 5-12. The Court dismissed Brill's initial Complaint for failure to plead the second element: willful acquisition or maintenance of that monopoly power through exclusionary conduct. *Id.* at 12. The Court concluded "merely 'strategic'" conduct is not enough; Brill must allege either Boats Group acted "out of a desire

[1] Unless indicated, FAC quotations are of Boats Group's non-public, "highly confidential" documents and corporate testimony, which were produced in this case or disclosed to the public for the first time on July 27, 2022, in litigation brought by a different plaintiff against Boats Group. *See* FAC ¶ 41 n.5.

to engage in exclusionary conduct or to gain monopoly power" or that the conduct produced an anticompetitive effect. *Id.* at 15. Brill has since obtained Boats Group's internal documents and corporate testimony that establish precisely that motivation and effect. Because Boats Group concealed the underlying materials, none of those allegations were in the initial Complaint.

1. **Boats Group willfully acquired monopoly power through the exclusionary roll up of YachtWorld and boats.com and the attendant network effects.**

Originally, Boats Group owned only Boat Trader. FAC ¶ 30. In 2004, Boats Group purchased Boat Trader's direct competitors, YachtWorld and boats.com, out of a desire to gain monopoly power. [redacted] *Id.* ¶¶ 30-32. [redacted] *Id.*

The acquisitions also generated significant barriers to entry into the Relevant Market. [redacted] *Id.* ¶¶ 33-34. Boats Group's CFO confirmed the anticompetitive nature of those network effects, testifying that "listings begets customers coming into your site that then begets more listings" in a "circular" dynamic, and "once you have a certain mass [of listings], it makes it hard for any "significant competitor [from] gain[ing] much from a . . . listings perspective" to "break into that cycle." *Id.* ¶ 59.

Boats Group identified several critical avenues for cementing its network effects, which served to protect and further entrench its monopoly power. [redacted] *Id.* ¶ 35. [redacted] *Id.* ¶¶ 27, 35, 38. [redacted] *Id.* [redacted] *Id.*

[redacted] *Id.* ¶¶ 36-38. [redacted]

[redacted] *Id.* ¶ 38. [redacted] *Id.* ¶¶ 38, 69. [redacted] *Id.*

**2. Boats Group willfully maintained its monopoly power through the YachtCloser acquisition and resulting entrenchment of network effects.**

In late 2016, Boats Group encountered YachtCloser, its "1st credible competitor" following the YachtWorld and boats.com acquisitions. *Id.* ¶ 41. [redacted] *Id.* ¶¶ 38, 41. But that was not the only risk to Boats Group's monopoly power. YachtCloser planned to expand into Boats Group's core listing business. *Id.* ¶ 43. Rather than compete, Boats Group extinguished the threat.

Boats Group's CFO Jim Selzer admitted YachtCloser was "starting to make . . . inroads into developing [competing] websites" and "might try to . . . develop and market an MLS" [multiple listing service] akin to "BoatWizard," which Boats Group offers through its platforms. *Id.* ¶ 43. Boats Group considered YachtCloser "more of a threat than anything else" and closely "watch[ed] YachtCloser as they reportedly plan[ned] to launch a consumer-facing website." *Id.* ¶ 44. In November 2016, YachtCloser announced the launch of YachtSpring.com, the "only MLS integrated with actual seller listing agreements" carrying "the most accurate and up-to-date listings on the market." *Id.* ¶ 45. YachtCloser was planning to launch an accompanying "Sold Boat Intelligence platform," [redacted] *Id.* ¶¶ 45, 53. [redacted] *Id.*

Boats Group initially considered competing with YachtCloser on the merits. Under the code name "Project Tugboat," Boats Group set out to develop an "MVP," or minimum viable product, in "response to YachtCloser." *Id.* ¶ 42. [redacted] *Id.* ¶¶ 42, 51. Ian Atkins, Boats Group's CEO, testified that YachtCloser's growth made Boats Group "very nervous," and Boats Group "believed [it] should acquire YachtCloser . . . to avoid the competitive threat." *Id.* ¶¶ 55-56. So Boats Group acquired it. *Id.*

On January 27, 2017—just two weeks after the acquisition closed—Boats Group announced that "YachtSpring.com [would] be sunsetted," and Boats Group removed the only independent MLS from competition with Boat Trader, YachtWorld, and boats.com. *Id.* ¶ 57. [redacted] *Id.* ¶ 53. [redacted] *Id.* ¶ 58.

"Highly confidential" internal analyses confirm the anticompetitive purpose of the acquisition. *First,* and top among Boats Group's enumerated reasons for the acquisition, [redacted] *Id.* ¶ 47. [redacted] *Id.* ¶ 49. [redacted] *Id.* ¶¶ 47-49.

*Second*, [redacted] *Id.* ¶ 53. In contrast, acquiring YachtCloser would [redacted] *Id.* ¶ 52. [redacted] *Id.*

*Third*, [redacted] *Id.* ¶¶ 48-49, 53. [redacted] *Id.*

[redacted] *Id.* ¶ 50. [redacted] *Id.* ¶¶ 48-50. [redacted]

[redacted] *Id.* ¶ 50.

Before Boats Group killed it, YachtCloser was a growing, durable competitor. [redacted] *Id.* ¶ 54. YachtCloser operated for nearly four years "without losing a single customer" and mounted aggressive price competition, offering its core service for $60 per month. *Id.* ¶ 58. By acquiring YachtCloser and dispatching its competing products, Boats Group eliminated that competition from the Relevant Market and, thereafter, [redacted] *Id.* ¶ 60.

**3. Boats Group's willful maintenance of monopoly power through the Trident Financial acquisition and resulting entrenchment of network effects.**

[redacted] *Id.* ¶¶ 63, 64. [redacted] *Id.* [redacted] *Id.* ¶¶ 62, 63. [redacted] *Id.*

[redacted] *Id.* ¶ 64. [redacted] *Id.* [redacted] *Id.* ¶ 65. [redacted] *Id.*

The Trident acquisition had similar anticompetitive purposes and effects. [redacted] *Id.* ¶¶ 62-63. [redacted] *Id.* ¶ 65. [redacted] *Id.* [redacted] *Id.* ¶ 76.

**4. Boats Group willfully maintained monopoly power through coercive pricing practices, which further entrenched its network effects.**

[redacted] *Id.* ¶¶ 61, 66.

[redacted] *Id.* ¶ 66. [redacted] *Id.* ¶¶ 2, 36. [redacted] *Id.* ¶ 67. [redacted] *Id.* [redacted] *Id.* ¶¶ 77-78.

Boats Group's coercive [redacted] served to maintain, if not grow, Boats Group's monopoly in the Relevant Market. [redacted] *Id.* ¶¶ 20, 68-69. [redacted] *Id.* [redacted] *Id.*. With this knowledge, Boats Group designed [redacted] *Id.*

[redacted]

[redacted] *Id.* ¶¶ 37, 69.

**5. Boats Group's conduct has foreclosed entry into the Relevant Market.**

Boats Group has succeeded in excluding new entrants, demonstrating the anticompetitive impact of its conduct. *Id.* In 2020, OneWater Marine ("OWM") launched boatsforsale.com, a competing platform featuring [redacted] *Id.* ¶ 29. Though "boats for sale" was "one of the top search phrases when shopping for a boat" and though, as one of the largest U.S. retailers of boats, OWM possessed a significant inventory of listings from which to grow, boatsforsale.com could never obtain meaningful market share, and OWM dispensed with the platform in 2025. *Id.* The International Yacht Brokers Association ("IYBA") launched *Yachtr*, another alternative platform, in 2024. *Id.* *Yachtr* has similarly struggled to gain listings and user traffic, despite its institutional backing and access to inventory through its broad membership. *Id.*

**6. Boats Group continues to target competitors to maintain its monopoly power.**

Boats Group's systematic targeting of the competition continues to this day. Most recently, Boats Group set its crosshairs on MarineSource, a "new entrant offering an AI-powered platform designed to improve efficiency, reduce costs, and increase access for both consumers and industry participants." *Id.* ¶ 71 (quoting documents filed in Boats Group's litigation against MarineSource). MarineSource launched its platform "to compete by offering a legitimate AI-driven alternative to Boats Group's legacy platforms" and has "established itself as a credible and emerging competitor in the online boating marketplace." *Id.*. Rather than compete with MarineSource, Boats Group sought to drown it with litigation. *Id.* In October 2025, Boats Group filed to enjoin MarineSource from posting listings and other public data, which Boats Group alleged MarineSource obtained by "deploy[ing] an automated bot, and scrap[ing] hundreds of thousands of listings from [Boats Group's] platforms." *Id.*

But Boats Group's allegations are "technical[ogically] impossible." *Id.* According to Boats Group's CTO, its platforms are "controlled and actively monitored" by "bot-detection protocols and anomaly-detection systems" that would detect and block any scraping by MarineSource, which allegedly involved "approximately 20 terabytes of data—the equivalent of tens of millions of photographs or more than a year of continuous video." *Id.* "Conduct of that magnitude could not have gone unlogged," yet "not a single alert was generated, a single log entry . . . created, or a single security event . . . triggered" by Boats Group. *Id.* Boats Group filed the suit "not as a response to genuine misconduct," but as "an effort by a dominant market participant … to hobble a legitimate new competitor." *Id.* ¶ 73.

## LEGAL STANDARD

A complaint need only "state a claim to relief that is plausible on its face," with all factual allegations accepted as true and "tak[en] in the light most favorable to plaintiff." Order at 3 (citations omitted). "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Id.* at 5.

## ARGUMENT

### I. THE AMENDED COMPLAINT PLEADS EXCLUSIONARY CONDUCT.

The Court dismissed Brill's original Complaint for a specific reason: Brill pleaded only "strategic" conduct, without alleging it was taken "out of a desire to engage in exclusionary conduct or to gain monopoly power" or that the conduct rendered "anticompetitive effect." *Id.* at 15. With the benefit of recently disclosed documents and testimony internal to Boats Group, Brill pleads new allegations—none of which were "previously rejected" by the Court—to remedy that defect.

#### A. Boats Group engaged in exclusionary conduct to gain monopoly power.

##### 1. The acquisitions were made to eliminate competition.

Boats Group acquired its competitors to gain, and then maintain, monopoly power. Boats Group acquired YachtWorld and boats.com because, in Boats Group's own words, [redacted] FAC ¶¶ 30-32. The acquisition left [redacted] *Id.* Years later, when Boats Group [redacted] since consolidating Boat Trader, YachtWorld and boats.com, [redacted] *Id.* ¶¶ 41, 47. [redacted] *Id.* ¶¶ 63-65. [redacted] *Id.*

By acquiring its competitors, Boats Group eliminated alternative platforms and, by centralizing their control and forcing their "cooperation," eliminated competition. That is exclusionary conduct. The Supreme Court explained in *United States v. Grinnell Corp.*:

> By acquiring ADT in 1953, Grinnell eliminated that alternative. Its control of the three other defendants eliminated any possibility of an outbreak of competition. . . . By those acquisitions it perfected the monopoly power to exclude competitors and fix prices.

384 U.S. 563, 576 (1966) (distinguishing acquisition from "a superior product, business acumen, or historic accident").[2] What renders the acquisitions anticompetitive—and what Brill could not allege

[2] "[N]o shortage of authorities observ[e] that … merging viable competitors to create a monopoly is a

before—is Boats Group's exclusionary intent and its realized effects.[3] Order at 15 (requiring intent).

**2. The acquisitions were made to entrench network effects.**

The FAC also adds allegations that [redacted] FAC ¶ 65. [redacted] to create a "circular" dynamic wherein "listings beget[] consumers" "beget[] more listings" that prevents "any significant competitor" from "break[ing] into that cycle" of [redacted] *Id.* ¶¶ 33-35, 59. [redacted] *Id.*

[redacted] *Id.* ¶ 33. *First,* Boats Group acquired YachtCloser to [redacted] *Id.* ¶¶ 38, 52. And Boats Group later acquired [redacted] *Id.* ¶¶ 27, 65. [redacted]

*Second*, Boats Group acquired YachtCloser [redacted] *Id.* ¶¶ 36-37. With respect to YachtCloser, [redacted] *Id.* ¶¶ 48-50. [redacted] *Id.* ¶¶ 63-64. [redacted]

---

clear § 2 offense." *Fed. Trade Comm'n v. Facebook, Inc.,* 581 F. Supp. 3d 34, 53 (D.D.C. 2022) (quoting 3 Areeda & Hovenkamp, *Antitrust Law*, at 200 (4th ed. 2015)). "[A] monopolist's acquisition of 'an actual or likely potential competitor is properly classified as anticompetitive, for it tends to augment or reinforce the monopoly by means other than competition on the merits." *Id.*

[3] This is true even if Boats Group initially acquired monopoly power by legal means. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979) ("Unlawfully acquired power remains anathema even when kept dormant. And it is no less true that a firm with a legitimately achieved monopoly may not wield the resulting power to tighten its hold on the market.").

[redacted] *Id.* ¶¶ 62-64.

Boats Group's fortification of network effects by way of these anticompetitive acquisitions is exclusionary. "[A] first mover is not entitled to maintain and magnify the relevant network effects by entrenching its dominance through anticompetitive conduct." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 949 (9th Cir. 2025), *cert. dismissed sub nom. Google LLC v. Epic Games, Inc.,* 146 S. Ct. 1051 (2026). In *Google Play Store*, the Ninth Circuit concluded "Google's conduct entrenched its dominance, causing [its] Play Store [platform] to benefit from network effects," explaining:

> Google erec[ted] barriers to insulate the Play Store from competition [with] the awareness that to get more developers, Amazon needed more users [and] Google was specifically interested in preventing Amazon from breaking those network effects. Its anticompetitive conduct was forward-looking, with the purpose—and ultimately the consequence[—]of preserving the market dominance that led to those network effects.

*Id.* at 949-50. Boats Group intended for the acquisitions to render the same effect, and the acquisitions are anticompetitive for that additional reason. *See* Order at 15 (requiring intent).

**3. Level Up was designed to foreclose market entry and entrench network effects.**

Boats Gorup designed Level Up with exclusive intent. Efforts by a monopolist "to obstruct entry of independent providers [may] be viewed as an abuse of its monopoly." *Olympia Equip. Leasing Co. v. Wester Union Telegraph Co.*, 797 F. 2d 370, 373 (7th Cir. 1986) (Posner, J.); *see also U.S. v. Google LLC*, 747 F. Supp. 3d 1, 163 (D.C. Cir. 2024) ("When 'a monopolist's actions are designed to prevent … new or potential competitors from gaining a foothold in the market by exclusionary . . . conduct, its success in that goal is … injurious to … competition."). Level Up is abusive in that way. *Grinnell*, 384 U.S. at 576 ("Pricing practices that contain[] competitors" are an "exclusionary practice[].").

[redacted] FAC ¶¶ 68-69. [redacted] *Id.* ¶¶ 2, 36, 67, 77-78.

Coercing its customers to spend more of their Wallet Shares on Boats Group's products served to (1) expand Boats Group's share of the Relevant Market; while (2) preventing customers from spending their fixed marketing budget on rival products to foreclose new entrants from gaining traction

in the Relevant Market, evidenced by the failures of OMW and IYBA. Boats Group did not achieve those ends through competition on the merits; it cannibalized Wallet Shares by stripping broker/dealers of free choice. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654–55 (2d Cir. 2015) ("[T]he market can determine whether one product is superior to another only 'so long as the free choice of consumers is preserved.'") (citing *Berkey Photo*, 603 F.2d at 287). Because Level Up "ha[d] the effect of significantly reducing usage of rivals' products and hence protecting [Boats Group's] own monopoly," the coercive Level Up scheme is "anticompetitive." *U.S. v. Microsoft*, 253 F.3d 34, 65 (D.C. Cir. 2001); *see also N. Jackson Pharmacy, Inc. v. Express Scripts Inc.,* 345 F. Supp. 2d 1279, 1292 (N.D. Ala. 2004) (Pricing practices designed to "bankrupt" competitors to allow defendants to "captur[e] a larger segment of the [relevant] market" and "charge higher prices" are anticompetitive.); Daniel L. Rubinfeld, *3M's Bundled Rebates: An Economic Perspective*, 72 U. Chi. L. Rev. 243, 256 (2005) (describing "strategic barrier to entry" created by pricing practice that leaves "no budgetary room for new entrants").

**4. Boats Group's efforts to exclude competition and entrench network effects continue with its attack on MarineSource.**

Boats Group's desire to engage in exclusionary conduct also motivates its predatory litigation against MarineSource. FAC ¶¶ 70, 71 Seeking "to use extraordinary judicial relief to hobble a legitimate new competitor," Boats Group sued to enjoin MarineSource on the baseless allegations that MarineSource "deployed an automated bot, and scraped hundreds of thousands of listings from [Boats Group's] platforms." *Id.* ¶¶ 71, 73 (quoting same).

The suit has no plausible factual basis, because Boats Group's allegations are "techn[ologically] impossible." *Id.* The suit also lacks any legal foundation. Listings are not Boats Group's "intellectual property"; they are generated by brokers, not by Boats Group, and they are available to the public on Boats Group's websites. FAC ¶ 71. Indeed, Boats Group represented to this Court that the listings are not proprietary to Boats Group. [ECF No. 15] at 12 (Brill "does not (and cannot) allege that Section 24.5.3 has prevented any seller from listing a boat for sale on any other online platform."). Boats Group disclaimed, and its contracts do not confer, any right to prevent customers from posting listings on MarineSource's rival platform. Its MarineSource suit is therefore objectively baseless. *See SecurityPoint Media, LLC v. The Adason Group, LLC*, 2007 WL 2298024, at * 5 (M.D. Fla. Aug. 7, 2007) (allegations that patentee misrepresented rights sufficient to show objectively baseless nature of suit).

The MarineSource litigation furthers two anticompetitive aims: (1) foreclose entry of a durable new competitor by bleeding it dry—not through outcome, but *process*—by forcing it to waste capital on frivolous litigation, and (2) extend Boats Group's stranglehold on listings to secure its network effects.

*See Star v. Demandware, Inc.,* 2015 WL 11438495, at *3 (S.D. Fla. July 6, 2015) (allegations that parties "threaten[ed] companies into either settling or, if the companies refused to settle, filing meritless lawsuits" were "sufficient to establish that the suit [was] objectively baseless and was filed with the subjective motivation to interfere with the business relationship of a competitor); *see also CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1074–75 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 1836 (2026) (finding allegations that defendant "imped[ed a competitor's] ability to access brokers' listing information that is otherwise available to the public" constitutes anticompetitive conduct). The MarineSource litigation therefore violates the antitrust laws, and Boats Group is not immunized from Brill's sham litigation claim.[4] *Cf. In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371, 1379–81 (N.D. Ga. 2010) (no immunity from sham suit in which patent clearly was not infringed).

**B. Boats Group's exclusionary conduct rendered anticompetitive effects.**

**1. Lessened competition and foreclosure of entry.**

Together, Boats Group's acquisitions and its coercive Level Up scheme resulted in the anticompetitive effects of lessened competition and foreclosure of new entry. *First,* the acquisition eliminated Boats Group's [redacted] and extinguished competition among the former rivals. *See McWane, Inc. v. F.T.C.*, 783 F.3d 814, 836 (11th Cir. 2015) ("[C]ompetitors and competition are linked[;] competition will not exist without competitors.") (quotations and citations omitted); *Facebook*, 581 F. Supp. 3d at 53 ("[M]ergers may . . . 'destroy competition itself' via 'means other than competition on the merits.'"). *Second*, Boats Group foreclosed successful new entry, including by soldboats.com and *Yachtr*, by entrenching its network effects through the acquisitions and Level Up. This, too, harmed competition: where a dominant platform (like Boats Group) takes action that "result[s] in network effects that ma[k]e it difficult for competitors to gain the volume of users and user data that would allow [for] the development of [competing] products," harm to competition results. *Arcell v. Google LLC*, 2025 WL 210877, at *1 (N.D. Cal. Jan. 16, 2025); *cf. McWane*, 783 F.3d at 838 ("[D]epriv[ing] rivals … of distribution sufficient to achieve efficient scale… rais[es] costs and slow[s] or prevent[s] effective entry," which "harm[s] competition.").

**2. Reduced output and diminished quality.**

Boats Group's exclusionary conduct also reduced output, stifled innovation, and diminished quality in the Relevant Market. By purchasing up, boxing out, or bleeding dry its rivals, Boats Group

---

[4] Even so, whether the "sham litigation" exception applies is an issue that presents questions of fact that cannot be resolved on a motion to dismiss. *Star,* 2015 WL 11438495, at *3.

reduced the number of platforms and, in turn, the number of listings, available in the online marketplace for the purchase of boats. [redacted] FAC ¶ 69. Boats Group's conduct has also reduced quality. [redacted] *Id.* ¶ 78. This again is the direct result of Boats Group's anticompetitive conduct. Boats Group killed off platforms that had [redacted] and starved out rivals that [redacted] *Id.* ¶¶ 29, 51. It has now set its sights on stifling the AI-innovation of MarineSource, which is "designed to improve efficiency, reduce costs, and increase access for both customers and industry participants." *Id.* ¶ 71. These are quintessential anticompetitive effects. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("Direct evidence of anticompetitive effects [include] reduced output, increased prices, or decreased quality in the relevant market."); *Cobb Theatres III, LLC v. AMC Ent. Holdings, Inc.*, 101 F. Supp. 3d 1319, 1335 (N.D. Ga. 2015) (where "consumers are being forced to purchase a product that is less desirable and of inferior quality" harm to competition is pleaded).

**3. Higher prices.**

Boats Group's exclusionary conduct also removed competitive constraints, allowing Boats Group to extract supracompetitive prices. To be sure, [redacted] FAC ¶¶ 48-50. Boats Group's bolstering of network effects—achieved through all of the acquisitions and Level Up—further eroded competitive constraints by "mak[ing] it difficult for new firms to enter the market" and compete on price, evidenced by the failed entry of OWM and IYBA. *Id.* ¶ 29.

Boats Group has extracted "higher than competitive prices" after removing these competitive constraints. *Id.* [redacted] *Id.* ¶ 76. [redacted] *Id.* [redacted] *Id.* ¶¶ 77, 79. These higher prices, resulting from Boats Group exclusionary conduct, are "direct evidence" of anticompetitive effect. *Am. Express*, 585 U.S. at 542.

#### 4. Harm to buyers.

The anticompetitive effects of Boats Group's conduct flow to buyers, too. FAC ¶ 94. Buyers have fewer platforms to turn to for boat listings, while the higher fees imposed on brokers and dealers are passed through to buyers in the form of higher prices. *Id.* And, as seller participation is diminished by rising costs and lack of viable alternatives, buyers face a reduction in available inventory, geographic limitations, and impaired access to critical listing information. *Id.* Buyers suffer from diminished quality, too. [redacted] *Id.* ¶¶ 51, 78.[5]

## II. BOATS GROUP'S SMATTERING OF DEFENSES FALLS SHORT.

### A. The Court has not "previously rejected" Brill's allegations.

Boats Group serially mischaracterizes, if not ignores, the FAC's new allegations,[6] representing incorrectly the FAC is limited to "conduct this Court previously found not to be anticompetitive." Mot. at 1. The FAC adds detailed allegations regarding Boats Group's "desire to engage in exclusionary conduct or to gain monopoly power" and resulting "anticompetitive effects," as required by the Court. The Court has not "previously rejected" those new allegations.

### B. Brill does not allege a tying claim.

Boats Group devotes pages to defeating a *per se* tying claim that appears nowhere in the FAC. Mot. at 14–16. What the FAC alleges is different: [redacted] FAC ¶¶ 66–70.

Courts judge such practices by their "practical effect" in light of "market realities," not "formalistic distinctions." *McWane*, 783 F.3d at 834; *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277, 281 (3d Cir. 2012) (de facto exclusivity through coercive pricing); *LePage's Inc. v. 3M*, 324 F.3d 141,

---

[5] Though mooted by its allegations of "reduced output, higher prices, [and] decreased quality" on the buyer-side of the market, *Am. Express*, 585 U.S. at 542, Brill disputes that such showing is required. *American Express* requires two-sided harm only for platforms that cannot sell to one side without *simultaneously* selling to the other. *Id.* at 544–48. That is not Boats Group.

[6] For example, Boats Group claims Brill "never alleges that, as part of the[] acquisitions, Boats Group engaged in any anticompetitive conduct." Mot. at 5. Not true. *See* Section I.A. Boats Group claims Brill "has not alleged that the acquisition of YachtSpring" or other conduct "foreclosed any future entry into the alleged relevant market." Mot. at 8, 18. Not true. *See* Section I.B.4. And Boats Group claims "Brill's primary allegation of harm remains its conclusory statement that Boats Group charged supracompetitive prices." Mot. at 17. Not true. *See* Sections I.B.

154–57 (3d Cir. 2003) (en banc) (bundled programs foreclosing rivals from limited customer spend). "Where a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting).

Through that lens, exclusionary conduct "tends to impair the opportunities of rivals," and "either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (citing 3 P. Areeda & D. Turner, *Antitrust Law*, 78 (1978)). Level Up lowered no prices and improved no product; it commandeered fixed budgets through coercion to starve rivals of contestable demand in the Relevant Market. Level Up meets the *Aspen Skiing* definition on its face. *See also N. Jackson Pharmacy*, 345 F. Supp. 2d at 1291.

**C. Boats Group is wrong that its anticompetitive intent must be ignored.**

Chief among its misstatements, Boats Group argues that anticompetitive intent must be ignored.[7] Mot. at 6. But the Court clearly ruled that the willful acquisition or maintenance of monopoly power may be shown by "anticompetitive effect" or the intent "to engage in exclusionary conduct or to gain monopoly power." Order at 15. Supreme Court precedent is in accord: "evidence of intent is … relevant to … whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *Aspen Skiing*, 472 U.S. at 603; *see also McWane*, 783 F.3d at 840 ("[C]lear anticompetitive intent … supports the inference that [conduct] harmed competition."); *Berkey Photo*, 603 F.2d at 274 ("[M]onopoly power, whether lawfully or unlawfully acquired, …violat[es] Section 2 [when] coupled with the purpose or intent to exercise that power.") (citations and quotations omitted). Boats Group's anticompetitive intent demonstrates the exclusionary nature and effect of its conduct.

**D. Boats Group's elimination of nascent competitors is anticompetitive.**

Boats Group is likewise wrong that "the acquisition of a potential competitor"—*i.e.*, YachtCloser or Trident—"is not enough to state an antitrust claim." Mot. at 7. "[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Microsoft*, 253 F.3d at 79. "The loss of nascent competitors is a clear anticompetitive effect." *Google*, 747 F. Supp. 3d at 165. This is true even if competitors enter the market but fail to achieve scale, as did boatsforsale.com and *Yachtr*, because "[c]onsumer injury results from the delay …

---

[7] Boats Group also ignores that Brill alleges anticompetitive *effects*, in addition to intent. *See* Section I.B.

the dominant firm imposes on the smaller rival's growth." *McWane*, 783 F.3d at 832 (citations omitted).

**E. The acquisitions harmed competition in the Relevant Market.**

Boats Group's argument that YachtSpring, YachtCloser, and Trident did not compete in the Relevant Market fares no better. Mot. at 7, 9-10. Boats Group itself identified YachtSpring, YachtCloser, and Trident as "competitors" of its platforms and their various marketing and listing services. FAC ¶¶ 41, 43, 63. Either way, Boats Group's acquisition of those rivals was anticompetitive, because the acquisitions eliminated emerging platforms, such as YachtSpring, and entrenched Boats Group's network effects. *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 968 (11th Cir. 2006) ("[T]he propriety of … acquisitions is measured by the competitive effects such acquisitions would have in the relevant market, not by the level of competition in the market for the target company"); *see also* Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952, 2039, 2042 (2021) ("Most … threats from nascent firms are not from head-to-head competitors," but "from a startup that offers a differentiated version, a complement, or some novel innovation.").

**F. The Motion relies on fact issues that cannot be resolved at the pleadings stage.**

Boats Group meanwhile seeks to inject, and then litigate, fact issues that cannot be resolved through a Rule 12(b)(6) motion to dismiss. *Cobb Theatres*, 101 F. Supp. 3d at 1335, 1339 (declining to weigh harm and exclusionary conduct at the pleadings stage). Boats Group disputes the alleged anticompetitive intent and effects, while gesturing at justifications for its conduct, such as "synergies," "international expansion," and "limiting free riding," which have positioned Boats Group as "the most effective 'one stop shop' for boat listing and marketing services," that one anonymous customer has "us[ed] … and it's great." Mot. at 9, 16. Not only are these assertions flatly contradicted by the FAC's allegations, "[w]hether valid business reasons motivated a monopolist's conduct is a question of fact" and "[b]alancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460 (7th Cir. 2020) (citations omitted). These fact-intensive issues, along with the sham litigation and statute of limitations defenses, *see* notes 4 and 11, cannot be determined on Boats Group's motion to dismiss.

**G. Brill's acquisition-based claims are not time-barred.**

**1. The continuing violation doctrine tolls Brill's acquisition-based claims.**

The continuing violation doctrine is neither rooted in nor cabined to the conspiracy context. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968) (originating the doctrine in a unilateral monopolization case); *see also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) (The doctrine applies when a defendant

commits "(1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'") (citation omitted) (emphasis added). Under the doctrine, a cause of action "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1043 (5th Cir. 1977) (continued collection of payments under unlawful tying agreement accrued new causes of action). "[E]ach sale or payment [at an artificially inflated price] constitutes a 'new' act that starts the running of the statute of limitations." *Bray v. Bank of Am. Corp.*, 784 F. App'x 738, 741 (11th Cir. 2019) (citing *Morton's Mkt.*, 198 F.3d at 828).

On that rule, a *purchaser* "may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period," because "the taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it." *Berkey Photo*, 603 F.2d at 296; *accord Mayor & City Council of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 130–33 (4th Cir. 2021) ("[E]ach time [defendant] sold [drug] at a supracompetitive price after its patent expired, it illegally exercised monopoly power[,] committing an overt act that caused injury and violated the antitrust laws. Accordingly a new limitations period began to run from each sale.") (collecting cases). Here, Brill alleges Boats Group charged, and continues to charge, supracompetitive prices within the statute of limitations window. FAC ¶ 76. Each increase inflicts new injury, and Brill's acquisition-based claims newly accrue.

Aside from sale-by-sale accrual, the doctrine applies to the acquisitions as part of Boats Group's ongoing, multi-faceted, [redacted] to gain and maintain monopoly power, which included, in addition to the acquisitions, anticompetitive conduct within four years of the initial Complaint: the Trident acquisition, Level Up scheme, continued gatekeeping of the SoldBoats data moat, and entrenchment of other network effects. *Id.* ¶ 70. To advance the [redacted], Boats Group put the assets it acquired to new, anticompetitive uses. For example, Boats Group killed off the YachtSpring MLS and relegated YachtCloser to eDocumentation services, ceasing to develop either product for the hidden purpose of precluding disintermediation of its flywheel-driven network effects. *See Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1188 (N.D. Cal. 2012). Boats Group then "scaveng[ed YachtCloser's] bones for features to incorporate into" Boats Group's own products, such as tightening gatekeeping control over critical data through expansion of its SoldBoats database. *Id.* Boats Group meanwhile employed the acquired assets to deplete marketing spend on rival products through Level Up, "thereby raising barriers to entry and decreasing competition." *Id.* Boats Group's new uses of YachtWorld, boats.com, and YachtCloser assets inflicted new injuries on Brill in

the form of higher prices and other anticompetitive effects. *See* Section I.B.

Because the acquisitions advanced Boats Group's multi-faceted, "Multiple Vector[]" scheme, FAC ¶ 70, through which Boats Group "undertook action, *in addition to price increases*, to monopolize [the Relevant Market]," this case is "excepted" from Boats Group's *per se* rule. *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014) (emphasis added).[8] The continuing violation doctrine applies, because—in addition to price increases—Boats Group used the acquired assets "in a different manner from the way … used at the time of the merger, and that the new use injured Plaintiff[]." *Free FreeHand,* 852 F. Supp.2d at 1187–88 (doctrine applied where merger "perpetuated [defendant's] monopoly power and caused … new injury after the merger [by] (1) ceasing development of [an acquired asset]; (2) channeling [the asset's] customers to [its own products]; and (3) bundling [acquired assets] with [defendant's] products").

**2. The fraudulent concealment doctrine tolls the acquisition-based allegations.**

Brill did not—and could not, because of Boats Group's concealment—learn of information necessary to sufficiently allege its YachtWorld, boats.com, and YachtCloser based claims until it uncovered internal documents and corporate testimony disclosed in state court litigation ("*Verihull*")[9] or produced by Boats Group in this case. The fraudulent concealment doctrine therefore "tolls the statute of limitations" for the acquisition-based claims. *In re Salmon*, 2021 WL 1109128, at *18 (S.D. Fla. Mar. 23, 2021) (citations omitted); *see also Morton's Mkt*, 198 F.3d at 832 ("The doctrine applies where a "defendant[] concealed the conduct complained of, and [plaintiff] failed, despite … due diligence …, to discover the facts that form the basis of [its] claim.").

With respect to YachtWorld and boats.com, the previously concealed materials revealed *inter alia*: (1) Boats Group viewed YachtWorld and boats.com as its [redacted] at the time it acquired those platforms, and that, following the acquisition the businesses [redacted] to remove price and quality competition among them; (2) Boats Group pursued the acquisitions with the anticompetitive intent of consolidating ownership over [redacted] and leaving [redacted] for Boats Group; and (3) its anticompetitive effect in generating network effects wherein "listings beget consumers … beget more listings" to

---

[8] Each component of the "Multiple Vector[]" scheme is anticompetitive on its own and, together, demonstrate a pattern of exclusionary conduct and generated a synergistic effect. *See* FAC ¶ 70. That is not "monopoly broth." *See Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980); *In re Google Digital Advert. Antitrsut Litig.*, 627 F. Supp. 3d 346, 381 (S.D.N.Y. 2022).

[9] *Verihull LLC v. Boats Group, LLC*, No. 2019-006963-CA-01 (Fla. 11th Cir. Ct.).

prevent "a significant competitor" from "break[ing] into that … cycle" to compete. FAC ¶¶ 31, 59, 75.

With respect to YachtCloser, the previously concealed materials revealed *inter alia*: (1) Boats Group "believed [it] should acquire YachtCloser to … avoid a competitive threat," rather than compete by building its own minimum viable product; (2) Boats Group's express objective was to "[e]liminate [its] largest competitive threat," so that it would "own … the market" and could extract price increases that would be "foregone due to increased competition"; and (3) Boats Group also desired to generate data-driven network effects (by positioning Boats Group as "the gatekeeper of critical data and make it extremely difficult to churn from our products") and flywheel-driven network effects (by blocking disintermediation of Boats Group's SoldBoats and BoatWizard products). *Id.* ¶¶ 41-42, 50, 59, 75.

Brill could not, without this information, plead the facts necessary to form the basis of its claims. Without these allegations of the (1) acquisitions' "anticompetitive effect" and (2) Boats Group's "desire to engage in exclusionary conduct" or "to gain monopoly power;" Brill could plead only that the acquisitions were "strategic." Order at 15. The Court ruled that is not enough. *Id.* But discovery uncovered facts demonstrating Boats Group's exclusionary intent and the resulting effects.

Brill could not have obtained those facts until confidential materials were publicly filed in the *Verihull* litigation or produced in this case.[10] The materials are internal to Boats Group, and Boats Group kept them concealed until ordered to produce them by the courts. *See Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, 2012 WL 6102068, at *13 (S.D. Fla. Dec. 7, 2012) ("[S]ince Defendants controlled all access to such sources, [plaintiff] could not have learned of [Defendants'] true [anticompetitive] purpose without either [Defendants'] internal documentation or an admission by [their] agent."). The fraudulent concealment doctrine tolled the statute of limitations on Brill's claims until at least **July 27, 2022**, when the *Verihull* materials were first disclosed. Brill filed its initial Complaint less than four years later, on August 14, 2025; the initial Complaint was timely filed.

Boats Group is wrong that Boats Group's public announcements provided constructive notice.[11] Mot. at 12 The announcements characterize the acquisitions as increasing "value" to Boats Group's customers and nothing more. FAC ¶ 75 (citing press releases). By excluding exclusionary intent

[10] The filing of the *Verihull* litigation, alone, is insufficient to put Brill on notice. *In re Beef Indus. Antitrust*, 600 F.2d 1148, 1171 (5th Cir. 1979) ("The mere filing of a similar lawsuit, without more, does not necessarily [suffice to give notice] because that suit might well be frivolous or baseless.").

[11] In any event, the Eleventh Circuit has "held, along with a majority of the circuits, that the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the jury" and cannot be resolved on a motion to dismiss. *Morton's Mkt.*, 198 F.3d at 832 (collecting cases).

and effect, Boats Group made "affirmatively misleading statements, which … obscured [its] anticompetitive conduct." *In re Salmon*, 2021 WL 1109128, at *18; *see also Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 605–06 (2d Cir. 2024) (by publicly announcing "*only* neutral criteria" and omitting "suppression of competitive third-party content as a factor," defendant fraudulently concealed its Sherman Act claim) (emphasis in original).[12] Without those disclosures, the public announcements did not put Brill on notice of its claims. *Credit Bureau Servs*, 2012 WL 6102068, at *13 ("[I]n view of [defendant's] public explanation[, plaintiff] could not have learned of [the] true purpose [of defendant's anticompetitive conduct] without [defendant's] internal documentation or an admission by [its] agent").

### 3. The Trident-based allegations relate back.

Brill's Trident-based allegations relate back to the initial Complaint, which alleged monopolization through "the serial acquisitions of its main competitors." [ECF No. 1] ¶ 3. The FAC alleges that Trident was part of that series. FAC ¶¶ 61-65. Boats Group's own authority asks "whether the old facts alleged could put the defendant on notice that the new claim might be part of the litigation." *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1368 (11th Cir. 2018). A serial-acquisition monopolization claim plainly noticed the acquisitions that followed in the series.

## III. BRILL'S OTHER CLAIMS SHOULD PROCEED, TOO.

Because the FAC states its Sherman Act claims,[13] Boats Group's Florida Antitrust Act claims (Counts III–IV) survive, and supplemental jurisdiction is proper. The FDUTPA claim (Count V) survives for the same reason: an antitrust violation is a *per se* FDUTPA violation, and Brill's overcharges are "actual damages," constituting and "injury in fact" and conferring standing to bring the claim. *See, e.g.*, *Democratic Republic of the Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 466-67 (11th Cir. 2015).

## CONCLUSION

Boats Group's Motion should be denied. Moreover, given that the FAC addresses the precise elements the Court instructed were lacking in the initial Complaint, Brill requests leave to amend in the event the Court finds any discrete allegation or theory to be lacking the requisite detail.

---

[12] For this reason, Boats Group's reliance on *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) is misplaced. The *Reveal* plaintiff "failed to allege the critical qualifying information …omitted [by defendant] when speaking to … the market," recognizing that "one who chooses to speak has a duty to include as much information as necessary to prevent misleading others." *Id.* at 993-95. Boats Group failed to supply that information in its press releases. *UPPI, LLC v. Jubilant Draximage Inc.* is inapt for a different reason: the purportedly concealed conduct "raise[d] antitrust red flags at the time." 2020 WL 6220818, at *24 n.34 (S.D. Ala. Sept. 18, 2020). No red flags were raised here.

[13] Brill's new allegations of anticompetitive conduct cure the deficiency identified by the Court with respect to its attempted monopolization claim. *See* Order at 23.

DATED August 11, 2026

Respectfully submitted,

**STUMPHAUZER KOLAYA & SLOMAN, PLLC**
Two South Biscayne Boulevard
Suite 1600
Miami, FL 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Timothy A. Kolaya*
TIMOTHY A. KOLAYA
Florida Bar No. 056140
tkolaya@skslegal.com
MATTHEW DELLABETTA
Florida Bar No. 1031216
mdellabetta@skslegal.com

-and-

**MILLER, THIBODEAUX, DYSART, VEITH & PASCHAL, LLC**
643 Magazine Street, Suite 405
New Orleans, LA 70130
Tel: (504) 977-9150

By: */s/ C. Hogan Paschal*
Kerry J. Miller, La. Bar. No. 24562
*(Pro Hac Vice)*
C. Hogan Paschal, La. Bar No. 38495
*(Pro Hac Vice)*
kmiller@mtdvp.com
hpaschal@mtdvp.com

***Attorneys for Plaintiff Brill Maritime, Inc. d/b/a Export Yacht Sales, individually and on behalf of all others similarly situated***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 11, 2026, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Timothy A. Kolaya*
TIMOTHY A. KOLAYA